(No. 64910.

*In re* JAMES BROOKE LEWIS, Attorney, Respondent.

*Opinion filed October 5, 1987.—Rehearing denied December 1, 1987.*

MILLER, J., took no part.

Daniel Drake, of Springfield, for the Administrator of the Attorney Registration and Disciplinary Commission.

Robert B. Oxtoby, of Springfield, and Stephen J. Heine and Karen L. Kendall, of Heyl, Royster, Voelker & Allen, of Peoria, for respondent.

JUSTICE SIMON delivered the opinion of the court:

Respondent, James Brooke Lewis, was charged by the Administrator of the Attorney Registration and Disciplinary Commission in a nine-count disciplinary proceeding with specific acts of converting client funds and with engaging in a pattern of conversion over a four- to five-year period. The Hearing Board found that the respondent had converted client funds and recommended

that respondent be suspended from the practice of law for two years and until further order of the court. The Review Board concurred in those factual findings, but a majority of the Review Board recommended that respondent be disbarred. Respondent argues that neither disbarment nor suspension are appropriate given the circumstances in this case.

The Administrator charged respondent in count I of the complaint with engaging in a pattern of conduct extending from 1980 to 1984 of commingling and converting clients' funds and failing to keep all such funds in identifiable trust accounts. (See 107 Ill. 2d R. 9—102.) Respondent admitted the allegation that in those years there were times when the combined balance in his client trust accounts was exceeded by the aggregate amount of client funds deposited in those accounts and not yet remitted to his clients. Further, the respondent admitted that during those years he failed to account to some of his clients for their funds or to promptly remit those funds to his clients.

Seven of the remaining eight counts charged specific instances of commingling and conversion. The other alleged an instance of respondent's fraud or deceit, but that count was rejected by the Hearing Board. Upon receipt of funds in settlement of his clients' claims in those seven conversion cases, the respondent deposited the settlement checks in one of his two trust accounts and then withdrew money from the trust accounts for use in his professional corporation's operating account. The respondent eventually paid his clients the sums to which they were entitled, in all but one instance with "interest" at a sometimes generous rate. The respondent has admitted the factual allegations of commingling and converting temporarily to his own use amounts totalling more than $100,000, but he takes issue with the reports and recommendations of the Hearing and Review

Boards, contending they gave short shrift to the respondent's suggestion that the misconduct occurred while the respondent was impaired due to asthma, mononucleosis and allergies aggravated by an addiction to pipe tobacco.

The respondent suggests that circumstances exist which mitigate against the imposition of discipline in excess of censure. Respondent contends that he was greatly fatigued by his poor health, the prescription drugs which he took to alleviate his allergies, and aggravation of those allergies caused by smoking a pipe. That state of fatigue reduced his interest in handling, what respondent's psychologist referred to as, the "mundane" aspects of running respondent's law office. In short, respondent argues that the conversions in this case occurred simply because of sloppy record keeping, inattention to bookkeeping details and apathy toward that aspect of his practice, but not because of any dishonest motive. The respondent points to the fact that none of his clients suffered a monetary loss and were compensated for the lost use of funds as evidence that there was no dishonest motive in his unethical conduct.

Both the Hearing and Review Boards rejected the respondent's contention of "mental incapacity." Their agreed evaluation of the evidence is entitled to essentially the same deference as that accorded findings by any other trier of fact (*In re Hopper* (1981), 85 Ill. 2d 318, 323), and it is amply supported. The testimony of respondent's clinical psychologist and treating allergist—while confirming that respondent suffered the fatiguing effects of asthma, allergies and antihistamines—belied any assertion that respondent's judgment or ability to distinguish between ethical and unethical practices was seriously impaired. Respondent's own character witnesses undercut his impairment arguments: two attorneys testified that they referred cases to respondent dur-

ing the time of his alleged impairment and were well-satisfied with respondent's performance; and two trial judges testified to respondent's demonstrated legal ability in trying complex cases before them in the years at issue.

Furthermore, the respondent claims that all but one of the specified acts of conversion occurred between January and September of 1983. (The one other stretched from the summer of 1981 through the following spring and was attributable, according to the respondent, to complex issues of conflicting interests and fear of depletion of a minor's injury award by the minor's parent.) During that time, the respondent claims, he was most severely affected by his physical ailments, including a bout with mononucleosis. Respondent suggests that this chronology illustrates the link between his poor health and the use of client funds, but we reject the position taken by the respondent. His answer to count I of the amended complaint admitted that acts of conversion and commingling occurred in years preceding 1983. Also, the respondent admitted in testimony before the Hearing Board that four other acts of conversion, not set forth in any of the specific counts in the amended complaint, took place in 1981 and 1982.

The conclusions of the Hearing and Review Boards that the respondent has not established the existence of an impairment which in any way excuses his unethical conduct are not against the manifest weight of the evidence; the question remains what discipline is appropriate. We have repeatedly stressed the importance of an attorney trust account and the gravity of converting client funds, even if done without an invidious motive. (See *In re McLennon* (1982), 93 Ill. 2d 215; *In re Clayter* (1980), 78 Ill. 2d 276.) Commingling or converting a client's funds is a matter of tremendous concern as it puts the client's money at risk of depletion or loss to credi-

tors of the attorney entrusted with its safekeeping. Violating that trust is disreputable not only for the attorney involved, but for the entire legal profession.

The respondent points to the imposition of censure in *In re McLennon* (1982), 93 Ill. 2d 215, *In re Young* (1986), 111 Ill. 2d 98, and *In re Clayter* (1980), 78 Ill. 2d 276, to suggest that censure is appropriate here too, but we do not regard those cases as analogous. In each of those cases, the attorneys were charged with single acts of converting far lesser sums than were converted by the respondent. Furthermore, in each of the cases cited by respondent, there were *bona fide* disputes which—although they did not justify conversion—explained the delay in remitting client funds. Respondent, on the other hand, has admitted 11 instances of conversion and unreasonable delay in remitting client funds, and in only one instance was there so much as a colorable justification for the delay. Even if the converted sums were used for "business" rather than "personal" expenses, as the respondent asserts without proof in the record, the distinction between a practitioner's business and personal finances is more formal than real, and it does not detract from the harm and danger of conversion as viewed from a client's perspective.

We believe that *In re Elias* (1986), 114 Ill. 2d 321, is more closely analogous to this case. Elias did not maintain trust accounts, depositing client funds in personal and business accounts instead, and he paid clients with checks that were in some cases dishonored. Although none of his clients suffered a permanent loss of funds, there was injury in that checks drawn against their accounts were sometimes dishonored after Elias' checks bounced. He was found to have commingled and converted client funds and to have deceived clients into endorsing settlement checks in return for checks written by Elias on accounts with insufficient funds. Elias was

suspended for three years. See also *In re Woldman* (1983), 98 Ill. 2d 248.

The discipline to be imposed against respondent must be selected with reference to the particular circumstances (*In re O'Hallaren* (1976), 64 Ill. 2d 426, 433) and the harm or exposure to unreasonable risk caused by his misconduct (*In re Saladino* (1978), 71 Ill. 2d 263, 276). The court is unwilling, however, to impose a mere censure for repeated violations of such a serious nature as those which occurred in this case merely because this attorney's clients were fortunate enough to have their money converted by a lawyer who did not harbor devious purposes or teeter on the brink of bankruptcy. It is past time for Illinois attorneys to accept their responsibilities in maintaining client trust accounts for the protection of their clients' financial interests and the reputation of the bar.

The respondent has been candid and contrite in answering the charges against him. There was substantial evidence from practicing attorneys, experienced trial judges and a former president of the Illinois State Bar Association of the respondent's good reputation, and he has made significant contributions of time and effort in *pro bono* representations. Under the circumstances, we believe that suspension of the respondent from the practice of law for three years is a sufficient and appropriate sanction.

*Respondent suspended.*

JUSTICE MILLER took no part in the consideration or decision of this case.