Docket No. 102578.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

BRIAN DOWLING, Appellee, v. CHICAGO OPTIONS ASSOCIATES, INC., *et al*. (DLA Piper Rudnick Gray Cary (US), LLP, Appellant).

*Opinion filed May 3, 2007.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Fitzgerald and Karmeier concurred in the judgment and opinion.

Justice Freeman concurred in part and dissented in part, with opinion, joined by Justices Kilbride and Burke.

## OPINION

Plaintiff, Brian Dowling, commenced proceedings to collect on two judgments he obtained against defendants, Chicago Options Associates and Michael E. Davis. In the process, Dowling learned that Davis had paid retainers to his lawyers, DLA Piper Rudnick Gray Cary (US), LLP (now known as DLA Piper (US) LLP) (hereafter Piper), in connection with efforts to protect his assets from Dowling's judgments. Dowling sought turnover of those retainers from Piper. The circuit court of Cook County ruled in Dowling's favor and

ordered Piper to pay over to Dowling the sum of $137,576.53. The appellate court affirmed. 365 Ill. App. 3d 89.

BACKGROUND

Dowling sued defendants for breach of contract. As a result of this action, two judgments were entered on behalf of Dowling in the total amount of $817,830.45. Thereafter, Davis set out to shield his assets from the reach of Dowling's judgments. In February 2003, Davis hired Piper to represent him in connection with the purchase of a home in Florida. For this purpose, Davis deposited a large sum of money in a trust account held by Piper. The purchase of the home was completed on February 24, 2003, with funds paid from the trust account. On February 26, 2003, Davis and his wife, Emily Seibel, authorized Piper to allocate $100,000 (the actual amount was $100,094.72) of that money as a retainer, based upon an agreement referred to by the parties as an "engagement letter." Piper transferred that money to its general account and applied it to monthly bills attributable to work performed for Davis and Seibel in connection with the purchase of their Florida home and, later on, in connection with the instant Illinois litigation with Dowling. The engagement letter was addressed to Davis and Seibel and referenced "Client Engagement; 308813–000020." It stated, in pertinent part, as follows:

"Dear Michael and Emily:

We are pleased to have the opportunity to represent you regarding your purchase of a home in Florida and to give you general advice regarding asset protection.

* * *

We customarily send monthly invoices for services rendered and other charges incurred for your account during the previous month. The monthly invoice details the work performed and the types of charges incurred. Payment will be due thirty (30) days after the date of our invoice. Payment should be made in U.S. dollars, in checks or drafts payable to 'Piper Rudnick LLP.'

You have authorized us to allocate $100,000 of the cash on hand as a retainer. These funds will be applied toward payment of the final monthly invoice containing entries with

-2-

respect to the above-referenced matter and will be subject to repayment by us if the amount of our fees for work done and costs incurred that remain unpaid do not equal the amount of the retainer then held by us. Under such circumstances, the balance of the retainer would then be returned to you when our representation of you on this matter ceases. We reserve the right to use any part of said funds to satisfy a delinquent payment, and to discontinue our representation until you forward funds to restore the full retainer.

* * *

*** Finally, I remind you that we are taking very aggressive positions to attempt to protect your assets and satisfy your related concerns. Those positions are likely to be attacked in litigation in Florida or Illinois. While we believe that our advice will, more likely than not, be upheld in court, given the animosity between you and the judgment creditor, litigation is a virtual certainty."

On September 23, 2003, a citation to discover assets was served on Davis; he failed to appear at the hearing on the citation and was eventually held in contempt for failure to appear. On October 17, 2003, a citation was issued to "Piper Rudnick LLP Trust," based upon the transfer of money from Davis' Chicago bank account to Piper for the purchase of his Florida home. Dowling filed a motion to require Piper to turn over all money belonging to Davis and held in Piper's trust account or, in the alternative, to enjoin Piper from distributing from its trust account any monies received from Davis. At a hearing on November 20, 2003, Piper, through one of its partners, Gerald B. Lurie, represented to the circuit court that Piper was not holding any funds for Davis in its trust account. Based on this information, the court denied Dowling's motion. Both citations were dismissed on June 8, 2004, and leave was granted to file a second citation. On June 8, 2004, Seibel drew a check for $50,000 on a Florida account belonging to her and Davis and gave it to Piper. Piper applied that money to its monthly bills for Davis and Seibel relating to Dowling's collection efforts.

Dowling's counsel subsequently learned that Piper had received funds from Davis which it had deposited in its general account. A second citation to discover assets was issued and served on Piper on

-3-

August 6, 2004. Piper produced records showing payments to Piper from Davis and Seibel and Piper's application of those payments. Dowling then filed a motion to turnover assets, requesting that Piper be ordered to pay Dowling $137,576.53 of the funds paid to Piper by Davis and Seibel. Those amounts consisted of $87,576.53, the balance on the $100,000 retainer as of October 27, 2003, and the $50,000 paid to Piper by Seibel on June 8, 2004. Oral argument was heard on April 18, 2005. The circuit court granted Dowling's motion and ordered Piper to pay Dowling $137,576.53. Piper filed a notice of appeal, seeking *vacatur* of the turnover order.

On appeal, Piper argued that the circuit court erred in ordering the funds turned over to Dowling. Piper argued that the retainers belonged, not to Davis, but to Piper. According to Piper, the only way Davis could have reclaimed those funds was to terminate Piper's representation of him. The appellate court disagreed, finding that Piper's argument concerning the ownership of the retainer funds was "disingenuous." The court found that the designation of the account in which Piper held the funds was not determinative of Piper's obligation to disclose to the circuit court that it held those funds. The court criticized Piper for not revealing the existence of the $100,000 retainer, which would have allowed the circuit court to determine whether the funds could be subject to a turnover order. The appellate court held that the trial court did not abuse its discretion in ordering the funds paid to Dowling, and it rejected Piper's argument that the unearned retainer funds did not belong to Davis. 365 Ill. App. 3d at 98.

Justice Hall dissented, noting that a "retainer" is defined both as a client's authorization for the attorney to act in a case and as a fee paid to a lawyer to secure legal representation. Thus, a retainer establishes the employment of the attorney by the client. In addition, Justice Hall opined, the fact that Piper could and did satisfy its fees from the retainer as they were earned did not mean that the retainer belonged to Davis. Justice Hall found it significant that Piper deposited the funds in its general account and not in a client trust account. In the absence of any contention that Piper violated disciplinary rules by doing so, Justice Hall would find that the funds were Piper's property, subject to a duty of reimbursement of any unused funds to Davis at the end of the representation. Justice Hall

was concerned that the majority's decision would have a chilling effect on the ability of judgment debtors to hire legal counsel to represent them and on the willingness of lawyers to undertake such representation. 365 Ill. App. 3d at 99 (Hall, J., dissenting).

We allowed Piper's petition for leave to appeal (210 Ill. 2d R. 315). We granted leave to the Illinois State Bar Association (ISBA) and the Chicago Bar Association (CBA) to file a brief *amici curiae.*

ANALYSIS

I

This appeal requires us to determine whether monies paid to Piper by Davis and Seibel in connection with Piper's legal representation belonged to Piper or to Davis and Seibel. As to the $100,000 retainer, the answer to this question hinges on the interpretation of the parties' written agreement by which Davis and Seibel agreed to pay the retainer. The interpretation of a contract involves a question of law, which we review *de novo. People ex rel. Department of Public Health v. Wiley*, 218 Ill. 2d 207, 223 (2006).

We must also determine whether the circuit court erred in ordering Piper to turn over to Dowling the $50,000 paid to Piper by Seibel. No written agreement accompanied this payment. We note that prior to ruling on Dowling's motion for a turnover order, the circuit court did not conduct an evidentiary hearing, nor did the court make any findings of fact. The court apparently relied on the parties' oral argument and the record. Accordingly, we review the court's ruling on this issue *de novo*. See *Northwest Diversified, Inc. v. Mauer*, 341 Ill. App. 3d 27, 33 (2003) (where trial court heard no testimony and based its decision on documentary evidence, deferential standard of review is inapplicable and reviewing court will make an independent decision on the facts).

II

Piper argues that the $100,000 paid to it in March 2003 by Davis was an advance payment retainer that became Piper's property when paid and was, therefore, not subject to a turnover order. Dowling argues that Piper has failed to meet its burden of demonstrating that the payment was in fact an advance payment retainer. Before

addressing these arguments, we must determine whether advance payment retainers exist and are permissible in Illinois.

Black's Law Dictionary defines "retainer" as:

> "1. A client's authorization for a lawyer to act in a case *** 2. A fee that a client pays to a lawyer simply to be available when the client needs legal help during a specified period or on a specified matter. 3. A lump-sum fee paid by the client to engage a lawyer at the outset of a matter. *** 4. An advance payment of fees for work that the lawyer will perform in the future." Black's Law Dictionary 1341-42 (8th ed. 2004).

Two types of retainers are generally recognized. The first is variously referred to as the "true," "general," or "classic" retainer. Such a retainer is paid by a client to the lawyer to secure the lawyer's availability during a specified period of time or for a specified matter. This type of retainer is earned when paid and immediately becomes property of the lawyer, regardless of whether the lawyer ever actually performs any services for the client. *In re McDonald Bros. Construction, Inc.*, 114 B.R. 989, 998 (N.D. Ill. 1990). The second type of retainer is referred to as a "security retainer." Under this arrangement, the funds paid to the lawyer are not present payment for future services; rather, the retainer remains the property of the client until the lawyer applies it to charges for services that are actually rendered. Any unearned funds are refunded to the client. The purpose of a security retainer is to secure payment of fees for future services that the lawyer is expected to perform. *McDonald*, 114 B.R. at 999. Pursuant to Rule 1.15(a) of the Illinois Rules of Professional Conduct, a security retainer must be deposited in a trust account and kept separate from the lawyer's own property. 188 Ill. 2d R. 1.15(a).

There is yet a third type of retainer, called the "advance payment retainer." This type of retainer consists of a present payment to the lawyer in exchange for the commitment to provide legal services in the future. Ownership of this retainer passes to the lawyer immediately upon payment. *McDonald*, 114 B.R. at 1000. Accordingly, the lawyer deposits the retainer into his or her general account; in fact, an advance payment retainer may not be deposited into a trust account, since a lawyer may not commingle property of a client with the lawyer's own property. 188 Ill. 2d R. 1.15(a).

-6-

This court has not often addressed the issue of retainers and their characteristics. An early case, *Union Surety & Guaranty Co. v. Tenney*, 200 Ill. 349 (1902), dealt with the issue of general or classic retainers and their enforceability. The lawyers in that case sued to enforce a contract providing that the client would pay a retainer of $1,000. The client, an insurance company, had engaged the law firm to represent it in its efforts to become licensed to do business in Illinois. The company later abandoned the project and did not pay the agreed upon retainer. In affirming the lower courts' decisions in favor of the lawyers, this court stated:

> "A retainer, as the word implies, is the act of the client in employing his attorney or counselor. The word is also used to denote the fee which the client pays his attorney when he retains him to act for him, and thereby prevents him from acting for his adversary. Here was a special contract for a retaining fee of $1000, and a recovery could be had on such a contract without proving any services at all, for the retainer precedes the rendering of services. If appellant, after retaining appellees as counsel, chose not to avail itself any further of their services, that was its privilege, but could furnish no ground for a refusal to pay the stipulated retaining fee." *Tenney*, 200 Ill. at 353.

In *In re Taylor*, 66 Ill. 2d 567 (1977), the respondent was disciplined for neglecting clients' cases. The clients had paid respondent retainers to represent them. Respondent did not perform the services and did not return the clients' money. In one instance, he was accused of converting a $150 fee he had been paid to defend a client in a wrongful-death action. Respondent did not perform the expected legal services and he failed to refund the fee. This court rejected the Administrator's argument that respondent had converted the funds. Although the court found that respondent had neglected his clients' cases and suspended him for one year, the court concluded that it was clear the money had been paid to respondent in exchange for expected legal services. *Taylor*, 66 Ill. 2d at 573. The court did not elaborate on its reasoning. However, the court's holding can be interpreted as implicitly recognizing that ownership of the retainer passed to the lawyer upon payment and was, therefore, not funds of his client.

-7-

Discussion of advance payment retainers has frequently arisen in the context of bankruptcy cases where, before filing a petition, a debtor's attorney receives a retainer for services to be rendered in connection with the debtor's bankruptcy case. The *McDonald* case is just such a case. As that court acknowledged, the answer to the question of who owns a pre-petition retainer is governed by state law. *McDonald*, 114 B.R. at 996. The court observed that there appeared to be no Illinois court decision authoritatively resolving the question of whether advance payment retainers are permissible, and that the issue had been primarily addressed by bar associations ethics committee opinions. Nonetheless, *McDonald* concluded that advance payment retainers are permissible in Illinois. The court first noted that Illinois recognizes the general rule of freedom of contract with respect to attorney fees. Second, the court noted that the ISBA has "repeatedly approved" advance payment retainers in response to arguments that such retainers violate the rules requiring segregation of client funds from those of the attorney. Finally, the court noted that Illinois courts have addressed challenges to advance payment retainers without suggesting that such retainers are impermissible. *McDonald*, 114 B.R. at 1001.

Another bankruptcy case from Illinois, *In re Production Associates, Ltd.*, 264 B.R. 180 (N.D. Ill. 2001), also addressed the issue of advance payment retainers. The court there noted that advance payment retainers may represent a full payment covering all services to be performed for the client, *i.e.*, a flat fee, or the payment may be a partial payment that the client will be required to replenish once legal services equal to the amount of the retainer have been rendered. Although the retainer belongs to the lawyer once paid, it is subject to refund if the representation ends before the retainer has been exhausted. The court noted that Illinois law does not bar advance payment retainers. *Production Associates*, 264 B.R. at 185.

The Illinois Rules of Professional Conduct (134 Ill. 2d R. 1.1 *et seq.*) do not currently recognize advance payment retainers. Rule 1.15(a) merely requires lawyers to segregate client funds, without specifying under what circumstances funds received by lawyers constitute funds of the client. Rule 1.15(d) requires lawyers to deposit all nominal or short-term funds belonging to clients in pooled interest-bearing trust accounts with the Lawyers Trust Fund of Illinois

designated as income beneficiary. 188 Ill. 2d R. 1.15(d). These rules assume that the determination as to who owns the funds at issue has already been made by the lawyer and client. However, the Attorney Registration and Disciplinary Commission (ARDC) has issued a Client Trust Account Handbook (ARDC 2001) (Handbook) in which it appears to interpret this court's decision in *Taylor* to recognize the validity of advance payment retainers. The purpose of the Handbook is to act as a guide to lawyers concerning the creation and maintenance of client trust accounts. In the section entitled, "Client Trust Accounting," the Handbook explicitly recognizes the distinction between security retainers and advance fee payments. In a section entitled "Where Are Retainers and Advances for Fees Deposited?" the Handbook states:

"[W]ith advance fee payments, the client agrees to pay in advance for some or all of the services that the lawyer is expected to perform on a particular legal problem. The prepayment is applied against the lawyer's hourly fee and the lawyer spends down the retainer as services are rendered. In Illinois, unless otherwise provided by statute or court order, the specific terms of the fee agreement with the client determine whether such prepayments remain the client's funds and must be deposited in the trust account until earned or whether they are the lawyer's funds and therefore must not be placed in the trust account.

If a lawyer and a client agree in writing or orally that the lawyer will deposit the prepayment in the client trust account and bill against it as the representation proceeds, the funds remain the property of the client and must be deposited in the trust account. Withdrawals can be made only with notice to and agreement of the client. On the other hand, if the lawyer and client agree that the prepayment is immediate compensation for the lawyer's commitment to perform future services, *e.g.*, a flat fee agreement, the funds are the property of the lawyer and may be deposited in the lawyer's operating or business account." Client Trust Account Handbook pt. IV(A)(5).

That section goes on to note that difficulties of interpretation arise where the lawyer and client do not have an agreement that explicitly

defines the type of retainer being paid. Although the ARDC acknowledges that this court has not definitively addressed the issue of whether advance fee payments constitute client funds or property of the lawyer for purposes of determining where the payments must be deposited, it found some support in this court's conclusion in *Taylor* that the unearned fees paid there in expectation of future legal services did not constitute client funds. The Handbook further reminds lawyers that, regardless of the type of account in which advance fees are deposited, they are subject to the lawyer's duty, as set forth in Rule 1.16(e) (134 Ill. 2d R. 1.16(e)), to promptly refund any part of a fee that is unearned when the representation ends.

Further support for the concept of advance payment retainers in Illinois comes from three ISBA advisory opinions. The first opinion, No. 703, was issued in November 1980 and involved questions of interpretation of former Rule 9–102(a) of the Illinois Code of Professional Responsibility, the antecedent to current Rule 1.15 of the Rules. One inquiry received by the Committee on Professional Conduct asked whether advance fees paid by clients must be segregated into a trust account until earned. Rule 9–102(a) provided that "all funds of clients" paid to a lawyer must be deposited in a separate trust account. After noting the different applications of that phrase by other jurisdictions, the opinion stated its conclusion:

> "This Committee is of the opinion that Illinois Rule 9–102(a) does not apply to retainer fees whatever form they may take unless when paid to the lawyer, they are expressly designated in writing to constitute security for fees to be earned. In the latter instance the funds would remain 'funds of the client' until earned and a default occurs in payment by the client. Otherwise, retainers paid by clients to lawyers, in whatever form, cease to be 'funds of the client' and accordingly in the opinion of the Committee are not governed by Supreme Court Rule 9–102." ISBA Op. No. 703 (November 1980).

In Opinion No. 722, issued in April 1981, the question addressed by the Committee was whether a law firm may enter into an agreement with a client for a noncancellable and nonrefundable retainer and what obligation the firm would have if the only service performed was the initial interview before the client terminates the representation. The Committee stated that the firm may use such an

agreement so long as the fee is not excessive. Although the opinion does not discuss the question of who owns such fees, it seems apparent that if a fee is nonrefundable, it belongs to the lawyer when paid. ISBA Op. No. 722 (April 1981).

The ISBA Board of Governors reaffirmed Opinion Nos. 703 and 722 in Opinion No. 90–10, issued in January 1991, following this court's adoption of the current Rules of Professional Conduct in 1990. In interpreting Rule 1.15, the Committee stated that, unless agreed otherwise by the lawyer and client in writing, advance fees paid by the client become property of the lawyer when paid. ISBA Op. No. 90–10 (January 1991). This suggests that our current Rule 1.15 contains a presumption in favor of an advance payment retainer.

We agree with *amici* that this court should explicitly recognize the existence of advance payment retainers in Illinois. We find support for such retainers in the *Taylor* and *McDonald* cases and in the ARDC Handbook and ISBA opinions referred to above. We also agree with the suggestions of *amici* regarding the necessity of reducing advance payment retainer agreements to writing and clearly setting forth the parties' intentions in those agreements.

Accordingly, we recognize advance payment retainers as one of three retainers available to lawyers and their clients in this state. The other retainers are the classic or general retainer and the security retainer. The type of retainer that is appropriate will depend on the circumstances of each case. The guiding principle, however, should be the protection of the client's interests. In the vast majority of cases, this will dictate that funds paid to retain a lawyer will be considered a security retainer and placed in a client trust account, pursuant to Rule 1.15. Separating a client's funds from that of the lawyer protects the client's retainer from the lawyer's creditors. See *In re Lewis*, 118 Ill. 2d 357, 362-63 (1987). Commingling of a lawyer's funds with those of a client has often been the first step toward conversion of a client's funds. In addition, commingling of a client's and the lawyer's funds presents a risk of loss in the event of the lawyer's death. *In re Clayter*, 78 Ill. 2d 276, 281 (1980). Thus, advance payment retainers should be used only sparingly, when necessary to accomplish some purpose for the client that cannot be accomplished by using a security retainer.

An appropriate use of advance payment retainers is illustrated by the circumstances of the instant case, where the client wishes to hire counsel to represent him or her against judgment creditors. Paying the lawyer a security retainer means the funds remain the property of the client and may therefore be subject to the claims of the client's creditors. This could make it difficult for the client to hire legal counsel. Similarly, a criminal defendant whose property may be subject to forfeiture may wish to use an advance payment retainer to ensure that he or she has sufficient funds to secure legal representation. We caution, however, that such fee arrangements, as well as those involving security retainers, are subject to a lawyer's duty to refund any unearned fees, pursuant to Rule 1.16(e) (134 Ill. 2d R. 1.16(e)). A client has an unqualified right to discharge a lawyer and, if discharged, the lawyer may retain only a sum that is reasonable in light of the services the lawyer performed prior to being discharged. Client Trust Account Handbook pt. IV(A)(5).

Any written retainer agreement, regardless of the type of retainer contemplated, should clearly define the kind of retainer being paid. If the parties agree that the client will pay a security retainer, that term should be used in the agreement; it should also state that the funds remain the property of the client until used to pay for services rendered and that the funds will be deposited in a client trust account. If the parties determine that an advance payment retainer best meets the client's needs, the written agreement must use that term and clearly state that the funds become the property of the lawyer when paid and that they will not be held in a client trust account.

Advance payment retainer agreements must be in writing and they must clearly disclose to the client the nature of the retainer, where it will be deposited, and how the lawyer or law firm will handle withdrawals from the retainer in payment for services rendered. Having a written agreement reduces the risk of misunderstandings between a lawyer and client regarding the nature of the retainer paid by the client. As the ARDC Handbook advises lawyers:

> "Because the character of the funds is determined by the fee agreement, it is wisest and most consistent with a lawyer's fiduciary obligations to assure that you and the client explicitly agree on how the advanced fees should be held and

to reduce that agreement to writing. If you do not do so, you risk being second-guessed, in hindsight, often when your relationship with the client has soured, when there is a disagreement about what services were promised, and when the retainer has already been spent." Client Trust Account Handbook pt. IV(A)(5).

A written agreement providing for an advance payment retainer must contain language advising the client of the option to place his or her money into a security retainer. The agreement must clearly advise the client that the choice of the type of retainer to be used is the client's alone; provided, however, that if the attorney is unwilling to represent the client without receiving an advance payment retainer, the agreement must so state, including the attorney's reasons therefor. In addition, an advance payment retainer agreement must set forth the special purpose behind the retainer and explain why an advance payment retainer is advantageous to the client.

Finally, in the event that the parties' intent cannot be gleaned from the language of their agreement, we conclude that the agreement must be construed as providing for a security retainer. While this is contrary to the ISBA's apparent construction of Rule 1.15, we conclude that, in most instances, construing an unclear retainer agreement to establish a security retainer will provide the greatest protection for a client's funds, since they will not be subject to the lawyer's creditors and withdrawals from the funds may be made only with notice to and agreement of the client. Reimbursement to the client of any unearned fees may also be facilitated by construing an unclear agreement as a security retainer, since the funds must be held separate from the lawyer's own funds. See Client Trust Account Handbook pt. IV(A)(5).

We are aware of the potential for abuse of advance payment retainers, particularly in circumstances such as the instant case where a judgment debtor seeks to resist efforts of a judgment creditor to collect on a judgment. No argument has been raised in this case that the retainers paid to Piper were excessive in light of the services that the parties anticipated Piper would render to Davis and Seibel. Therefore, it is unnecessary for us to comment further on this question. We would only caution that Rule 1.5(a) of the Rules of

Professional Conduct requires that a lawyer's fee be reasonable in light of the factors set forth therein. 134 Ill. 2d R. 1.5(a).

III

We now turn to the question of whether the $100,000 retainer paid to Piper by Davis and Seibel in February 2003 was an advance payment retainer, as Piper claims, or a security retainer in which Davis and Seibel maintained an ownership interest. Both Piper and Dowling accept, in principle, the concept of advance payment retainers.

When construing a contract, the court's primary objective is to give effect to the intent of the parties, as revealed by the language they used in their agreement. *In re Doyle*, 144 Ill. 2d 451, 468 (1991). A contract should be given a fair and reasonable construction based upon all of its provisions, read as a whole. *United Airlines, Inc. v. City of Chicago*, 116 Ill. 2d 311, 318 (1987).

Initially, we note that Dowling accuses Piper of attempting to assist Davis in committing a fraud upon Dowling by failing to disclose the balance on the $100,000 retainer it was holding in its general account. We disagree with Dowling and with the circuit court and the appellate court majority that Piper was required to disclose at the first citation hearing the fact that it was holding funds received from Davis in its general office account. The first citation to discover assets that was served on Piper was addressed to "Piper Rudnick LLP Trust" and sought information regarding money paid by Davis to Piper's trust account. Although claiming that no such entity existed, Piper appeared and advised the circuit court that it held no money belonging to Davis in its trust account. Piper was not required to do more. Since the retainer was held in Piper's general office account, that retainer was not covered by Dowling's citation. We do not agree with the appellate majority that Piper's actions in this regard were "disingenuous."

Dowling's primary argument is that the $100,000 retainer could only be used to pay for Piper's services rendered in connection with the matter number referenced by the written agreement. He points to the fact that the engagement letter referenced only matter No.

308813–000020 and that the letter described this matter number as, "General," while the matter number assigned to Piper's representation of Davis in the Illinois litigation against Dowling's collection efforts was No. 308813–000001 and was named "Adv. Brian Dowling." The matter number referenced in the letter involved only the purchase of the Florida home of Davis and Seibel and general advice concerning the protection of the couple's assets. Dowling notes that Piper sent no bills referencing that matter number after July 2003. Hence, there remained a balance on the retainer of $87,576.53 as of October 27, 2003.

Piper argues that by focusing on the matter number referenced in the engagement letter, Dowling ignores the language of the letter itself, which clearly anticipates that further services would be required beyond the purchase of the Florida home and general advice regarding asset protection. Piper refers to the following statements at the end of the letter:

> "Finally, I remind you that we are taking very aggressive positions to attempt to protect your assets and satisfy your related concerns. Those positions are likely to be attacked in litigation in Florida or Illinois. While we believe that our advice will, more likely than not, be upheld in court, given the animosity between you and the judgment creditor, litigation is a virtual certainty."

Based upon this language, Piper argues the engagement letter clearly anticipated that the $100,000 retainer would be used for litigation with Dowling and that such litigation was nearly inevitable.

We note that as of the February 25, 2003, date of the letter, Dowling had not commenced his collection efforts. Those efforts did not begin until September 2003, with service of a citation to discover assets on Davis. As Piper asserts, the reason that matter No. 000020 was assigned a "general" designation is because, at that time, no effort had been made by Dowling to collect on his judgments. Thus, we agree with Piper that the word "general" was not intended as a restriction on the type of legal work Piper might perform for Davis and Seibel.

-15-

Dowling also argues that the ARDC Handbook and Rule 1.15 make it clear that an advance payment fee is for services to be performed on a specific matter. However, a reading of the rule and of the Handbook reveal no such mandate. In its current form, Rule 1.15 does not even address the issue of whether a retainer paid by a client becomes the property of the lawyer or remains the property of the client. Rather, it is the language of an advance payment retainer agreement that expresses the intent of the parties to the agreement. Should a lawyer and his or her client wish to restrict an advance payment retainer to a specific matter, they are free to express that intent in their agreement; likewise, should an advance payment retainer be intended to encompass several legal matters or range of services, the parties may so provide in their agreement. We are aware of no rules limiting advance payment retainer agreements in the manner suggested by Dowling.

Finally, Dowling argues that, because there is no clear evidence that the engagement letter provided for an advance payment retainer, we should construe the agreement as providing for a security retainer. He further asserts that, to the extent the agreement does call for an advance payment retainer, it was a retainer only for the matter number referenced by the letter and not for any other matter, such as the instant Illinois litigation.

After careful consideration, we conclude that the $100,000 paid by Davis and Seibel to Piper in February 2003 was an advance payment retainer whose ownership passed to Piper upon payment. While the agreement does not explicitly identify the retainer as an advance payment retainer, this fact is not fatal to a finding that an advance payment retainer was intended. There is no impediment, either in the case law or in our Rules of Professional Conduct, to the ability of lawyers and their clients to agree that a retainer paid shall become the property of the lawyer upon payment. We find it significant that the agreement here does not require that Piper deposit the $100,000 retainer in a client trust account. It requires only that the retainer be used in connection with Piper's representation of Davis and Seibel with regard to the purchase of their Florida home and protecting their assets from the reach of Dowling's judgments. We also note that the engagement letter does not require Piper to obtain

permission from Davis and Seibel before it could apply the retainer to its legal bills, as would be expected in a security retainer agreement. See Client Trust Account Handbook, pt. IV(A)(5) (property that must be held in a client trust account includes "[p]repayments for legal services where, under the terms of the fee agreement with the client, the advanced fees remain the client's money until the lawyer has performed services and the client agrees to the amount of fees earned and authorizes disbursement"). We find some of the language of the engagement letter to be ambiguous. For example, the letter seems to assume that Davis and Seibel would make payments in addition to the retainer itself and Piper reserves to itself the right to use any part of the retainer to satisfy a delinquent payment. While the agreement is not a model of clarity, nonetheless, considering the agreement as a whole and viewing it in the light of the circumstances of the parties, *i.e.*, Davis's status as a judgment debtor who wishes to place his assets outside the reach of his judgment creditor, we do not find it unreasonable to construe the agreement as an advance payment retainer.

While we have today recognized the validity of advance payment retainers in Illinois and have suggested how agreements establishing those retainers should be structured, the standards governing such retainers are to be given prospective application. Therefore, it would be inequitable to judge Piper's retainer agreement by those standards. We conclude that the engagement letter, taken as a whole, provides for an advance payment retainer which, upon its payment, belonged to Piper. Accordingly, the circuit court erred in ordering Piper to turn over the balance on the retainer to Dowling.

IV

Piper argues that the circuit court erred in ordering that the $50,000 payment made to Piper by Seibel on June 8, 2004, be turned over to Dowling. Piper submits that there was no pending citation at the time this payment was made and that the funds were used to pay the legal bills of Davis and Seibel prior to the service of the second citation on Piper; accordingly, the funds were not properly subject to turnover. Dowling argues that both Piper and Davis were under citation on the date the payment was made and that there is no

-17-

evidence that the citation had been dismissed before Seibel made the payment. We note that neither the circuit court nor the appellate court directly addressed Piper's arguments with respect to the $50,000 payment.

We agree with Piper that there is no reason to believe that it would have counseled Davis and Seibel to transfer to Piper the sum of $50,000 at a time when Davis was prohibited from making just such a transfer of funds. The citations against Davis and Piper were dismissed on June 8, 2004. Further citations were served upon Davis sometime after June 25, 2004, and against Piper on August 6, 2004. Dowling essentially asks us to presume that the $50,000 payment was made prior to the June 8, 2004, dismissal of the citations. We decline to do so. Absent some evidence to the contrary, we will not presume that Piper would have advised its clients to deliberately ignore a pending citation in making the $50,000 payment. Nor will we presume that Piper would itself purposely violate the requirements of an existing citation.

With regard to the application by Piper of the $50,000 payment to its bills for legal services rendered to Davis and Seibel, Piper states that it had fully applied the funds by August 5, 2004, one day prior to being served with the second citation. Dowling responds by asserting that, following receipt of the second citation, Piper spent money that "may have been the property" of Davis and that Piper was ordered to turn over its billing records and statements. Piper indeed turned over numerous documents and billing records to Dowling's counsel pursuant to the citations. However, Dowling's citation to the record does not support his contention that Piper spent money belonging to Davis at a time when it was under citation. We conclude that the $50,000 payment made to Piper by Seibel was not paid at a time when either Davis or Piper were subject to any of the various citations to discover assets. We also conclude that Piper applied all of those funds to its legal bills prior to being served with the second citation on August 6, 2004. Accordingly, the circuit court erred in ordering Piper to turn those funds over to Dowling.

CONCLUSION

Today we recognize the existence and validity of advance payment retainers as an option available to Illinois lawyers and their clients in connection with the payment and use of retainers. We conclude that the engagement letter in this case between Piper and its clients, Davis and Seibel, provides for an advance payment retainer that was not subject to a turnover order by the circuit court in Dowling's collection proceedings. We further conclude that the $50,000 payment made to Piper by Seibel was paid to Piper and used by it to pay its legal bills at a time when neither Piper nor Davis were subject to any restrictions on the transfer of funds. Accordingly, we reverse the judgments of the circuit and appellate courts.

*Appellate court judgment reversed;*
*circuit court judgment reversed.*

JUSTICE FREEMAN, concurring in part and dissenting in part:

I fully agree with the majority's thorough and well-reasoned decision to recognize the existence and validity of "advance payment retainers" as an option available to Illinois lawyers and their clients in connection with the payment and use of retainers. I further agree with the majority's decision to identify the specific requirements that must be present in a fee agreement between an attorney and client in order for it to constitute an advance payment retainer. This recognition, in my view, provides both the bench and bar with much-needed guidance in this important area of Illinois law. I therefore concur in parts I, II and IV of the majority opinion.

I must part company with the majority, however, with respect to the analysis and holding set forth in part III of its opinion. Specifically, I do not agree with the majority's holding that the $100,000 paid by Davis and Seibel to Piper in this case was an "advance payment retainer." It is my belief that the appropriate disposition of this appeal is to remand the cause to the circuit court for further proceedings in which both parties, Dowling and Piper (and its clients Davis and Seibel), can present evidence with respect to the proper characterization of the fee retainer and the acknowledged ambiguities contained within that document. Despite relying upon

-19-

several federal bankruptcy court decisions which state that the determination of the type of retainer which exists between an attorney and client is a question of fact to be decided in the trial court, the majority disregards these precepts. Instead, this court–a court of review–sits in this case as a finder of fact and bases its holding solely upon the February 25, 2003, engagement letter–the same letter, I must point out, which the majority candidly acknowledges to be "ambiguous." I submit that these points reveal internal inconsistencies within the majority opinion.

The question presented by this appeal is whether the $100,000 paid to Piper by Davis and Seibel under the February 2003 engagement letter belong to Piper or to its clients, Davis and Seibel. The answer to this question, in turn, determines whether these funds are available to satisfy the judgments obtained by Dowling against Davis. As noted by the majority in its opinion, Dowling has maintained the position before this court that because there is no clear evidence in the record that the engagement letter was intended to provide for an advance payment retainer, this court should therefore construe the agreement as providing for a security retainer under which the money paid to Piper remains the property of the client until the lawyer applies it to charges for services that are actually rendered. Dowling concludes, therefore, that the $100,000 transferred by Davis and Seibel to Piper remained the property of Davis and Seibel–even though held by Piper–and was available to satisfy Dowling's judgments.

In its opinion, the majority rejects Dowling's contention that the agreement between Piper and its clients in this case constituted a security retainer, and, instead, holds that the agreement was an advance payment retainer. In arriving at the conclusion that an advance payment retainer is present in the instant matter, the majority characterizes its analysis as an "interpretation of a contract," and cites to *People ex rel. Department of Public Health v. Wiley*, 218 Ill. 2d 207, 223 (2006), for the proposition that contract interpretation "involves a question of law, which we review *de novo*." Slip op. at 5. The majority fails to recognize, however, that in the very case it cites, this court held that construction of a contract is a matter of law in only those instances where *no ambiguity* exists. See *Wiley*, 218 Ill. 2d

-20-

at 223, citing *Farm Credit Bank v. Whitlock*, 144 Ill. 2d 440, 447 (1991); see also *Gunthorp v. Golan*, 184 Ill. 2d 432, 440 (1998). Indeed, in instances where language in a contract is ambiguous–such as found by the majority in the matter at bar–"its construction is then a question of fact, and parol evidence is admissible to explain and ascertain what the parties intended." *Farm Credit Bank*, 144 Ill. 2d at 447.

In light of these fundamental principles of contract interpretation, it is therefore significant that, in construing the agreement between the parties, the majority readily acknowledges that "some of the language of the engagement letter [is] ambiguous" (slip op. at 16), and also candidly admits in its opinion that "the agreement [between Piper and its clients Davis and Seibel] is not a model of clarity" (slip op. at 17). In light of the very ambiguities found by the majority to exist in the agreement between Piper and its clients, one would accordingly expect this court to conclude that the characterization of which type of retainer exists in this case is a question of fact to be determined, in the first instance, by the trial court, where additional relevant evidence–such as sworn testimony–can be adduced.

The majority, however, defeats this expectation by construing–as a matter of law–the agreement between Piper and its clients, Davis and Seibel, as an advance payment retainer. The majority makes this determination despite the fact that the above-discussed rules of contract interpretation call for this matter to be remanded to the circuit court for fact finding. The majority also arrives at this conclusion despite the fact that the same federal bankruptcy court decisions upon which it relies with respect to guidance in setting forth the various types of retainers also establish procedural rules which call for fact finding in determining the character of a specific retainer, and which, therefore, do not support the majority's disposition of the instant cause. See *In re McDonald Bros. Construction, Inc.*, 114 B.R. 989, 1002 (Bankr. N.D. Ill. 1990) ("a dispute about the terms of any particular retainer agreement can only be resolved as a question of fact," and the absence of a "carefully drawn" retainer agreement necessitates that the court ascertain "the parties' intentions from the circumstances surrounding the payment"); *In re Production Associates, Ltd.*, 264 B.R. 180, 188 (Bankr. N.D. Ill. 2001) (citing

*McDonald* for the proposition that "inquiry into the nature of Counsel's retainer is a question of fact"). The majority's own opinion demonstrates in this case that there is an absence of a carefully drawn retainer agreement (see slip op. at 16-17), which, therefore, requires that findings of fact must be made. As a court of review, it is improper for us to resolve this fact-dependent issue. See *Sohaey v. Van Cura*, 240 Ill. App. 3d 266, 276 (1992) (it is the function of the finder of fact, "not an appellate court, to determine both the disputed and undisputed facts of the case and to draw from those facts the reasonable inferences they support").

Finally, I further note that, in part II of the majority opinion, the majority states that "in the event that the parties' intent cannot be gleaned from the language of their agreement, we conclude that the agreement must be construed as providing for a security retainer." Slip op. at 13. The majority sets forth this caution based upon its "aware[ness] of the potential for abuse of advance payment retainers, particularly in circumstances such as that in the instant case where a judgment debtor seeks to resist efforts of a judgment creditor to collect on a judgment." Slip op. at 13. Yet, in part III of its opinion, the majority fails to heed its own cautionary admonishment in this case by construing–as a matter of law–the agreement between Piper and its clients to constitute an advance payment retainer despite finding that the agreement is also ambiguous. Given the fact that the majority recognizes the potential for abuse under the facts presented in the instant appeal, it is far more prudent to remand this matter to the circuit court for an evidentiary hearing wherein parol evidence can be adduced–including statements made under oath–which would guard against such abuse.

In sum, I believe that the proper disposition of the instant appeal is for this court to remand this cause back to the circuit court for further proceedings to discern the intention of Piper and its clients, Davis and Seibel, with respect to the specific fee agreement at issue here. As explained above, this issue presents a question of fact, and the parties to this appeal should be afforded the opportunity to present evidence in the circuit court–including sworn testimony from the witness stand–with respect to whether Piper and its clients, Davis and Seibel, intended this agreement to constitute an advance payment

retainer. I am not convinced by the majority opinion that it is appropriate for this court–a court of review–to make a determination with respect to the characterization of the retainer based only upon an examination of the four corners of an admittedly ambiguous document.

For the reasons set forth above, I dissent from part III of the majority opinion.


JUSTICES KILBRIDE and BURKE join in this partial concurrence and partial dissent.