# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*In re Marriage of Earlywine*, 2012 IL App (2d) 110730

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF JOHN J. EARLYWINE, Petitioner, and JESSICA A. EARLYWINE, Respondent (Thomas H. James, Contemnor-Appellant; Richard Haime, Contemnee-Appellee). |
| District & No. | Second District<br>Docket No. 2-11-0730 |
| Filed | July 13, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | An order requiring that a portion of the money held in an advance payment retainer by petitioner's divorce counsel be turned over to respondent's counsel as interim attorney fees was upheld pursuant to section 501(c-1)(3) of the Marriage and Dissolution of Marriage Act as a means of furthering the policy of establishing parity between the parties to dissolution actions by "leveling the playing field." |
| Decision Under Review | Appeal from the Circuit Court of Stephenson County, Nos. 10-D-119, 10-OP-202; the Hon. Theresa L. Ursin, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |

Counsel on Appeal

Thomas H. James, of James & Associates, of Forreston, for appellant.

No brief filed for appellee.

Panel

JUSTICE BOWMAN delivered the judgment of the court, with opinion.
Justices Burke and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    Petitioner, John J. Earlywine, petitioned to dissolve his marriage to respondent, Jessica A. Earlywine. During the dissolution proceedings, respondent's attorney, Richard Haime, petitioned for interim attorney fees. The trial court granted that petition, ordering petitioner's attorney, Thomas H. James, to turn over to Haime $4,000 that James held in an advance payment retainer that petitioner had paid him. James moved to reconsider, the trial court denied the motion, and James refused to turn over the funds, asking, instead, that the trial court hold him in friendly contempt. The court did so and imposed a $50 sanction. At issue in this appeal is whether James may be ordered to turn over to Haime funds held in an advance payment retainer. We determine that he may. Accordingly, we affirm the trial court's turnover order.

¶ 2    The facts relevant to resolving this appeal are as follows. One child, a son, was born to petitioner and respondent. That son was three years old when petitioner petitioned to dissolve the marriage. Petitioner sought to dissolve the marriage when respondent allegedly engaged in repeated acts of mental and physical cruelty toward petitioner. Petitioner also claimed that respondent was abusive toward the parties' son. Respondent contended that petitioner was likewise guilty of such conduct, citing the fact that, during the marriage, "[petitioner] was reported to [the Department of Children and Family Services (DCFS)] following one of [his] arrests for Domestic Violence and the outcome of [the DCFS] investigation was founded."

¶ 3    Given respondent's alleged abuse, petitioner petitioned for an order of protection against respondent. That petition was granted, and on August 24, 2010, in the midst of subsequent proceedings in that matter, petitioner hired James to represent him in his "matrimonial or family related matters thereto or otherwise under Illinois Family Law." Petitioner's petition to dissolve the marriage was filed that day. The attorney-client agreement executed between petitioner and James provides, among other things, that "[petitioner] agreed to an advanced [*sic*] payment retainer." The agreement then, in compliance with Rule 1.15 of the Illinois Rules of Professional Conduct (Ill. Rs. Prof. Conduct R. 1.15 (eff. Jan. 1, 2010)), delineates the components of the advance payment retainer. An affidavit from petitioner's mother explains that the funds in the advance payment retainer came from her, her fiancé, petitioner's father, and petitioner's father's wife. Petitioner's financial affidavit reflects that

his parents and stepparents paid James $8,750. This money is listed as a debt.

¶ 4 On August 27, 2010, three days after petitioner and James executed the agreement, the trial court entered an order in the order-of-protection proceedings that provided, among other things, that "[b]oth parties are prohibited from selling or transfering [*sic*] marital property." A similar order was entered in the marriage-dissolution case on November 10, 2010.

¶ 5 During the dissolution-of-marriage proceedings, it was revealed that, although petitioner was working as a union electrician on a part-time and sporadic basis, he had been unemployed for a long time and had accumulated over $66,000 in debt. As a result of his financial situation, petitioner moved in with his mother. Respondent, who was unemployed during the parties' marriage, was also unemployed during the dissolution proceedings. She, like petitioner, had moved in with her parents. Both parties sought custody of their son.

¶ 6 Given respondent's limited funds, Haime filed a petition for interim attorney fees. Pursuant to section 501(c-1) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/501(c-1) (West 2010)), Haime sought $5,000 in interim attorney fees, claiming that, given that the dissolution of marriage concerned, among other things, custody of the parties' son, his fee request was reasonable. Haime asked the court to, if necessary, "order disgorgement of any amounts paid by [petitioner] to [James.]"

¶ 7 In response, James claimed that petitioner should not have to pay respondent any interim attorney fees, because he, like respondent, had no money to pay his own attorney. Nowhere in his response did James mention that petitioner had paid him using an advance payment retainer.

¶ 8 The trial court granted Haime's petition for interim attorney fees. In doing so, the court found that Haime's request for fees was reasonable and that respondent was unable to pay her attorney fees. The court then found that, despite petitioner's financial situation, petitioner had the financial ability to pay respondent's attorney fees. Specifically, the court stated:

"[A] substantial amount has been paid to [James] from other sources. The court does believe it is reasonable to order that [James] disgorge a portion of those fees in order to achieve substantial parity. While [petitioner] does not have the current ability to put forth funds to support [Haime's] fees, the court believes that as requested in the motion filed by [Haime] and as allowed by statute, that an equitable solution is to require disgorgement of the fees paid to [James] by [petitioner's parents and stepparents] in the amount of $4000."

¶ 9 Thereafter, James filed a motion to reconsider. Attached to the motion was the attorney-client agreement that petitioner and James executed in August 2010 and the affidavit prepared by petitioner's mother. The trial court denied the motion to reconsider, finding:

"[Petitioner] argues that the fees paid to his attorney are in the nature of an 'advance payment retainer' as opposed to an advance of the marital estate and therefore are not subject to disgorgement. The stated policy of [section] 501(c-1)(3) [of the Marriage Act (750 ILCS 5/501(c-1)(3) (West 2010))] is to achieve 'substantial parity between the parties.' That section further expressly designates 'retainers . . . . previously paid' as a source for disgorgement.

Public policy allowing divorce litigants to participate equally should override the

advance payment retainer device of protecting the fees of one side. To allow [petitioner] to shelter the fees paid on his behalf as an advance payment retainer defeats the purpose of the 'substantial parity' provisions of the *** Marriage Act. Divorce court is a court of equity, in which the court has a substantial amount of discretion."

¶ 10    James moved the court to find him in friendly contempt, the court granted the motion, and the court entered a $50 sanction. This timely appeal followed (see Ill. S. Ct. R. 304(b)(5) (eff. Feb. 26, 2010)).

¶ 11    At issue in this appeal is whether an attorney in a dissolution-of-marriage action who is paid for his services via an advance payment retainer may be ordered, pursuant to section 501(c-1)(3) of the Marriage Act (750 ILCS 5/501(c-1)(3) (West 2010)), to turn over to opposing counsel as interim attorney fees monies held in that retainer. Before addressing that issue, we note that no appellee's brief has been filed in this case. The lack of an appellee's brief does not prevent us from addressing the issue raised, as the record is simple and the claimed error is such that we can decide it without the assistance of an appellee's brief. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 12    Turning to the merits, resolving the issue raised requires us to consider section 501(c-1)(3) of the Marriage Act in light of *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277 (2007). In *Dowling*, our supreme court discussed the two generally recognized types of retainers in existence in Illinois in 2007. The first, referred to as a " 'true,' " " 'general,' " or " 'classic' " retainer, is payment securing the attorney's availability during a specific period or for a specific matter. *Id.* at 286. This retainer "is earned when paid and immediately becomes property of the lawyer, regardless of whether the lawyer ever actually performs any services for the client." *Id.* The second type is a " 'security' " retainer, in which payments made remain the property of the client until the attorney applies it to charges for services actually rendered. *Id.* Because the money belongs to the client, a security retainer must be deposited in a separate client trust account. *Id.* After detailing these two types of retainers, the *Dowling* court "explicitly recognize[d] the existence of advance payment retainers," which were not generally recognized in Illinois prior to that. *Id.* at 292. This retainer represents a present payment to the attorney for his commitment to provide legal services in the future. *Id.* at 287. Monies in advance payment retainers become property of the attorney immediately upon payment and are deposited into the attorney's general account. *Id.*

¶ 13    After acknowledging that advance payment retainers were now viable in Illinois, our supreme court cautioned that "advance payment retainers should be used only sparingly, when necessary to accomplish some purpose for the client that cannot be accomplished using a security retainer." *Id.* at 293. For example, the court determined that an advance payment retainer would be appropriate "where[, as was the case in *Dowling*,] the client wishes to hire counsel to represent him or her against judgment creditors." *Id*. An advance payment retainer is more appropriate in that context because "[p]aying the lawyer a security retainer means the funds remain the property of the client and may therefore be subject to the claims of the client's creditors." *Id.* Because the funds remain the client's, it could be difficult for the client to hire legal counsel but for the option of paying the attorney via an advance payment retainer. *Id.*

¶ 14    Pursuant to *Dowling*, James claims that he properly executed an advance payment retainer with petitioner and that, because the monies in that retainer belong to him and not petitioner, the trial court could not order James to turn over any money in the retainer to Haime. We disagree.

¶ 15    First, our supreme court explicitly stated in *Dowling* that advance payment retainers should be used sparingly and only to accomplish some specific purpose for a client that other forms of retainers would greatly frustrate. *Id.* Permitting the use of an advance payment retainer in this case would serve the purpose of doing away with leveling the playing field between the parties. We do not believe that this is the type of purpose our supreme court envisioned when it condoned the use of advance payment retainers.

¶ 16    Moreover, in interpreting section 501(c-1)(3) of the Marriage Act (750 ILCS 5/501(c-1)(3) (West 2010)), which was enacted in 1997, 10 years before *Dowling* was decided, we believe that advance payment retainers are subject to turnover in marriage-dissolution cases.

¶ 17    Section 501(c-1)(3) of the Marriage Act provides:

"(c-1) As used in this subsection (c-1), 'interim attorney fees and costs' means attorney's fees and costs assessed from time to time while a case is pending, in favor of a petitioning party's current counsel, for reasonable fees and costs either already incurred or to be incurred, and 'interim award' means an award of interim attorney's fees and costs. Interim awards shall be governed by the following:

* * *

(3) In any proceeding under this subsection (c-1), the court (or hearing officer) shall assess an interim award against an opposing party in an amount necessary to enable the petitioning party to participate adequately in the litigation, upon findings that the party from whom attorney's fees and costs are sought has the financial ability to pay reasonable amounts and that the party seeking attorney's fees and costs lacks sufficient access to assets or income to pay reasonable amounts. *** If the court finds that both parties lack financial ability or access to assets or income for reasonable attorney's fees and costs, the court (or hearing officer) shall enter an order that allocates available funds for each party's counsel, *including retainers* or interim payments, or both, *previously paid, in a manner that achieves substantial parity between the parties*." (Emphases added.) *Id.*

¶ 18    In interpreting whether this section of the Marriage Act allows for monies in an advance payment retainer to be turned over to opposing counsel, we are guided by the well-settled rules of statutory construction. The fundamental objective of statutory construction is to ascertain and give effect to the legislature's intent. *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009). The most reliable indicator of legislative intent is the statutory language, which must be given its plain and ordinary meaning. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 216 (2008). When the statutory language is clear and unambiguous, it must be applied as written without resorting to extrinsic aids of construction. *MidAmerica Bank, FSB v. Charter One Bank, FSB*, 232 Ill. 2d 560, 565 (2009). In interpreting a statute, we will not depart from the plain statutory language by reading into

that language exceptions, limitations, or conditions that conflict with the expressed intent of the legislature. *Id.* at 565-66. That is not to say, however, that we cannot consider the purpose for enacting the statute. *In re Marriage of Rosenbaum-Golden*, 381 Ill. App. 3d 65, 72 (2008). Rather, " 'the court may consider the reason and necessity for the statute and the evils it was intended to remedy, and will assume that the legislature did not intend an unjust result.' " *Id.* The interpretation of a statute presents a question of law, which we review *de novo*. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 64.

¶ 19   Here, the language of section 501(c-1)(3) of the Marriage Act provides that, in order to establish substantial parity between the parties in a dissolution-of-marriage action, the court may order that funds held by one party's attorney in a "retainer" be turned over to opposing counsel as interim attorney fees. The statutory language does not limit what type of "retainer" is subject to this disgorgement. That is, the statutory language does not characterize the "retainer" as " 'true,' " " 'general,' " " 'classic,' " " 'security,' " or " 'advance payment.' " See *Dowling*, 226 Ill. 2d at 286-87. Given that the statute does not specify what type of retainer is subject to disgorgement, the question with which we are left is how to interpret a statute that uses a general term that encompasses many specific terms.

¶ 20   Instructive on this issue is *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1 (2009). There, four years after they vacated their apartment, two tenants sued their landlord pursuant to a municipal ordinance for their security deposit plus interest. *Id.* at 3-4. The landlord moved to dismiss, arguing that the statute of limitations had run. *Id.* at 6. At issue was whether the tenants' cause of action fell within the two-year statute of limitations in section 13-202 of the Code of Civil Procedure (735 ILCS 5/13-202 (West 2004)). *Landis*, 235 Ill. 2d at 6. That is, whether the tenants' cause of action was for a " 'statutory penalty.' " *Id.* Our supreme court determined that "statutory" included a municipal ordinance. *Id.* at 12. In reaching that conclusion, the court observed that "[i]t is a general principle of statutory interpretation that we give statutes the fullest, rather than the narrowest, possible meaning to which they are susceptible." *Id.* at 11.

¶ 21   Here, like in *Landis*, we must give "retainer" its fullest possible meaning. Thus, "retainer" means any type of retainer, including, for purposes of this appeal, advance payment retainers. So even though, under *Dowling*, the money in the advance payment retainer technically belonged to James and not petitioner, the trial court could order that that money be turned over to opposing counsel.

¶ 22   Strong policy considerations underlie our decision on this point. See *Rosenbaum-Golden*, 381 Ill. App. 3d at 74. That is, the legislature provided for an award of interim attorney fees as a way to " 'level the playing field' " between spouses going through the dissolution of their marriage. *Id.* By "leveling the playing field," a spouse who has access to funds to pay for an attorney cannot control the litigation between the parties and put the opposing spouse at a disadvantage in participating in the litigation. *Id.* If we were to construe the statute in the way that James suggests, by concluding that the funds in the advance payment retainer are not subject to section 501(c-1)(3), we would be defeating the very purpose of the statute. We cannot do this. See *Harvel v. City of Johnston City*, 146 Ill. 2d 277, 284 (1992) ("If the language of a statute is susceptible to two constructions, one of which will carry out its purpose and another which will defeat it, the statute will receive the former construction.").

¶ 23 In reaching this conclusion, we are also aware of the fact that the money in the advance payment retainer was loaned to petitioner by his parents and stepparents. Although we are sure that petitioner's family had no intention that the money they gave James to pay for petitioner's legal fees would also be used to pay respondent's attorney, that fact does not change our result. In *Dowling*, our supreme court had to consider only whether a judgment creditor could seek satisfaction of the judgment by making claims to money held in the advance payment retainer that the debtor had with his attorney. Although *Dowling* involved a large sum of money, at stake here are the lives of petitioner, respondent, and their young son. The evidence presented indicated that their family life was volatile at best. To say that James is not required to turn over money in the advance payment retainer to Haime could result in even more damaging life changes. Such a result would not advance any public policy of which we are aware.

¶ 24 For these reasons, the turnover order of the circuit court of Stephenson County is affirmed. However, we vacate the contempt order, as James acted solely to respectfully test the propriety of the turnover order. See *Dufour v. Mobile Oil Corp.*, 301 Ill. App. 3d 156, 162-63 (1998).

¶ 25 Affirmed in part and vacated in part.