# Illinois Official Reports

## Appellate Court

---

*Doctors Oxygen Service, Inc. v. Cannon Management Group, LLC*,
**2017 IL App (2d) 170003**

---

| | |
|---|---|
| Appellate Court Caption | DOCTORS OXYGEN SERVICE, INC., d/b/a Medgas Solutions, Plaintiff-Appellee, v. CANNON MANAGEMENT GROUP, LLC, Defendant (Friedler Construction Company, Intervenor-Appellant). |
| District & No. | Second District<br>Docket No. 2-17-0003 |
| Filed | December 18, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 16-MR-201; the Hon. Bonnie M. Wheaton, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Edward L. Filer and Garry L. Wills, of Roetzel & Andress LLP, of Chicago, for appellant.<br><br>Kevin M. Lyons and Laura E. Alms, of Lyons Law Group, LLC, of Downers Grove, for appellee. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion.<br>Justices Schostok and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1      This appeal comes to us from supplementary proceedings instituted by plaintiff, Doctors Oxygen Service, Inc., doing business as Medgas Solutions (Doctors), to enforce an underlying judgment totaling $105,551.71 against defendant, Cannon Management Group, LLC (Cannon). Doctors filed a citation to discover assets and a motion for turnover. Intervenor, Friedler Construction Company (Friedler), alleged superior rights to the same funds and moved for turnover. The trial court granted Doctors' motion for turnover and denied Friedler's motion. On appeal, Friedler argues that (1) the funds at issue were not subject to Doctors' judgment lien because the funds were not an "asset" of Cannon, (2) even if the funds were an "asset" of Cannon, the funds should have been awarded to Friedler under the doctrine of equitable subrogation, and (3) the trial court erred by determining that Friedler had a legitimate remedy, which was to make a claim against the surety. We affirm.

¶ 2                     I. BACKGROUND

¶ 3         A. Doctors' Citation to Discover Assets Against Cannon

¶ 4      On December 1, 2015, Doctors obtained a default judgment against Cannon in the United States District Court for the Northern District of Illinois in the amount of $105,551.71. On February 16, 2016, Doctors registered the default judgment with the trial court and filed a citation to discover assets against Cannon. On March 2, 2016, Thomas Cannon, a purported disabled veteran and the owner of Cannon, was served with the citation. Thomas Cannon failed to appear, and the trial court issued a rule to show cause. After Thomas Cannon was served by special service, he appeared on August 4, 2016. On August 17, 2016, Doctors moved for a temporary restraining order (TRO), alleging that Thomas Cannon had fraudulently transferred Cannon funds to accounts held by Vet Tec Mechanical (Vet Tec), Cannon's successor entity. On August 18, 2016, the trial court granted Doctors' motion, freezing any and all funds held by Fifth Third Bank and any account held by Cannon, Thomas Cannon, or Vet Tec.

¶ 5      On August 29, 2016, at Thomas Cannon's direction, the United States Department of Veterans' Affairs (VA) wire-transferred $79,599.19 to the Vet Tec account at Fifth Third Bank. On August 31, 2016, the trial court entered an order requiring Fifth Third Bank to disburse all funds into an "interest on lawyer trust account" (IOLTA) held by Doctors' counsel, and the trial court ordered that those funds not be distributed.

¶ 6                   B. Friedler Moves to Intervene

¶ 7      On September 8, 2016, Friedler filed an "Emergency Petition to Intervene and To Amend and Modify the Temporary Restraining Order." Friedler alleged and argued the following. Cannon had been hired by the VA to work on a construction project in North Chicago (the VA project). The VA required Cannon to obtain a performance-and-payment bond. Zurich American Insurance Company (Zurich) and its subsidiaries, including Fidelity and Deposit Company (Fidelity) (collectively, the surety) provided the bond. In October 2009, the surety and Friedler entered into a contract wherein Friedler agreed to indemnify the surety from any and all claims asserted on any construction projects in which the surety provided bonds in favor of Cannon (indemnity agreement).

¶ 8 Friedler also alleged that in July 2015 Cannon abandoned and defaulted on the VA project. The VA declared Cannon in default and made a claim to the surety on the bond. In accordance with the indemnity agreement, Friedler completed the construction work on the VA project. Cannon agreed and acknowledged that the remaining $121,286.52 due and owing on the VA project was owed to Friedler because Friedler and its subcontractors fully performed the remaining work on the VA project. Friedler had informed the VA that it was performing the remainder of the work on the project, but the VA refused to pay Friedler directly. The $79,599.19 that the VA transferred into Cannon's account on August 29, 2016, was part of the money that Cannon owed to Friedler. Because the aforementioned funds never belonged to Cannon, such funds were not an "asset" of Cannon, could not be used to pay Doctors, and should not be subject to the TRO. Friedler moved to intervene and to amend and modify the TRO to provide that all monies paid to Cannon for work performed by Friedler be distributed to Friedler.

¶ 9 Friedler attached to its pleading the indemnity agreement, which indicated that Thomas Cannon, the "President" of Cannon, was the named "Contractor" and that Thomas Cannon and Friedler were the "Indemnitors." Friedler also attached to its pleading a July 9, 2015, letter from Thomas Hardy, a VA contracting officer, addressed to Paul Greco, a representative of the surety, stating:

"[T]he Government considers [Cannon] to be in default of the contract. After issuance of a show cause notice on Tuesday, July 7, 2015, [Cannon] sent the Contracting Officer the following e-mail:

*** 'Jason

I'm pulling off the site……deal with it in court.

Tom'

The [VA] interprets this communication as a repudiation of the contract. Therefore[, the] VA is entitled to immediately terminate the contract for default.

Before officially terminating the contract and filing a formal claim against the performance bonds your company issued, the Government would like to give you the opportunity to pursue other options in lieu of termination for default in accordance with FAR 49.402-4, Procedure in lieu of termination for default. If you are interested in exploring an amicable way of completing the work under contract VA69D-12-C-0224 without the contract being terminated for default, please reach out to me by close of business tomorrow in order to discuss this important issue."

¶ 10 Friedler also attached a July 31, 2015, letter from Eric Friedler, Friedler's president, to Greco, stating, in part:

"The purpose of this letter is to state how [Friedler] intends to move forward to complete this project and achieve final acceptance by the government.

On July 27, 2015, Bob Burnette and I attended a meeting at the project site with representatives of the VA. *** Led primarily by Mr. Schild [of the VA], we were given a walk through showing the remaining scope of work that the VA believes is required to be completed and/or corrected to achieve final completion of this project. *** At the conclusion of the meeting Ms. Morris [(of the VA)] asked us to provide them with our general plan and approach for completing this project. *Given that there is no privity of contract between the VA and* [*Friedler*], we are providing this letter to

- 3 -

you with the understanding that you will forward it to the VA with your own cover letter.

First, I want to reiterate that [Frielder] is absolutely committed to completing this project per the plans and specifications. I also firmly believe that we are ideally suited as a general contractor to complete the remaining scope of the work. *** [T]o do that, we will take the following steps:

* * *

4. *Once we have an agreement with [the surety] and the VA that we will are [sic] authorized to complete the project*, we will arrange for site visits with our subcontractors. ***

5. Although [Cannon] will not continue to work as a subcontractor on this project, we do plan on using Tom Cannon as a consultant because he does have extensive knowledge of the project. In addition, he still has contractual liability for its completion.

* * *

*Given that that [sic] Friedler Construction has the ultimate financial liability to the completion of this project through its indemnification of [the surety], I am not willing to turn over that responsibility to a third party general contractor*. That third party would not be better qualified than Friedler Construction and I would lose control over the cost to complete the project. I am not willing to do that. If the VA is interested in negotiating a final settlement of this project and an appropriate credit to the VA for the cost to complete the project, I am certainly willing to discuss that. Otherwise, we are fully prepared to move forward pursuant to the plan presented above. I will wait to hear from you or the VA until any further action is taken." (Emphases added.)

¶ 11    On September 12, 2016, Doctors filed its response to Friedler's petition, alleging and arguing the following. Friedler was an unsecured potential creditor under a possible breach-of-contract claim against Cannon. Even if Friedler was seeking to enforce a valid contract claim against Cannon, it was attempting to reach funds ahead of Doctors, a secured judgment creditor. In his July 31, 2015, letter to the surety, Eric Friedler stated that Friedler was willing to step in to complete the project because Friedler was the indemnitor of the project. Eric Friedler acknowledged that "[t]here is no privity of contract between the VA and [Friedler]." Friedler's petition also acknowledged that it "completed Cannon's work under Cannon's agreement with the [VA]." Funds deposited by the VA into the Vet Tec account were Cannon's funds under the VA contract because Cannon directed the VA to deposit funds into the Vet Tec account. Therefore, these funds were subject to the citation against Cannon.

¶ 12    Doctors also argued that Friedler's interests were aligned with Cannon's, which explained why Friedler had not taken any action against Cannon. Doctors alleged that Friedler and Cannon were joint-venture business partners and that Friedler's interests in this case were thus aligned with Cannon's. Friedler and Cannon were represented by the same law firm. Thomas Cannon testified during the citation hearing that Eric Friedler acted as a "mentor" to him, lent him his creditworthiness, and gave him financial support through Friedler, thereby enabling him to secure bonds for Cannon's projects. In addition, Friedler had paid for or secured the retainer of Cannon's counsel, Freeborn & Peters, to represent

Cannon in its previous litigation with Doctors. Further, bank records confirmed that Friedler routinely wired Thomas Cannon and Cannon "substantial funds on a monthly basis" until February 2016, when Doctors filed its citation to discover assets. In addition, Thomas Cannon refused to comply with the TRO with respect to his electronic records and e-mails and failed to preserve and produce his computers' hard drives for mirror-imaging as ordered by the court. Doctors attached a 2015 "Cannon Friedler Joint Venture Agreement" (joint venture agreement), which purpose was to submit a bid for work at Midway International Airport. The joint venture agreement contains a "Proposal to Be Executed by a Joint Venture," submitted by the "Friedler Cannon Midway Joint Venture." A "Small business Enterprise and Veteran-Owned Business Enterprise Joint Venture Affidavit" is attached to the proposal and appears to contain the signature of Thomas Cannon.

¶ 13    On September 12, 2016, the trial court allowed Friedler to intervene.

¶ 14    On September 15, 2016, Doctors filed a "Supplemental Response Brief in Response to Friedler's" petition, addressing an alternate theory raised by Friedler during argument on September 12. Friedler's alternate theory was that it claimed intervention on behalf of subcontractors that performed work under Cannon's general contract with the VA. Doctors argued that it, a secured judgment creditor, held rights superior to those of Friedler, an unsecured alleged creditor. Friedler, as a subcontractor, could seek relief under the Miller Act (40 U.S.C. §§ 3131-3134 (2012)) by seeking payment against the surety.

¶ 15    On September 21, 2016, Friedler filed its reply, alleging and arguing, in part, the following. The funds at issue were (1) not an asset of Cannon, and therefore, Doctors could not claim any interest in them, (2) related to work performed after Cannon was terminated from the VA project, and (3) paid to Cannon only because the VA's rules required the VA to pay the party that entered into the original contract. Because the funds were not an asset of Cannon, Cannon had no right to them and there was no need for the court to make a priority determination. The Miller Act was irrelevant because Friedler was not a subcontractor. Also, Friedler did not enter into a joint venture with Cannon on the VA project. Finally, even if the funds were an asset of Cannon, equitable subrogation applied and the funds should be distributed to Friedler. Friedler was not a creditor of Cannon; rather, it was simply the rightful recipient of the funds. Friedler attached to its reply a complaint filed in the United States District Court for the Northern District of Illinois under the Miller Act by the United States on behalf of Cyril Regan Heating against Cannon and Friedler. A fax from Cannon was attached to the complaint, indicating that Cannon was "Disabled Veteran Owned."

¶ 16    Doctors' surresponse alleged and argued in part that Cannon's contract with the VA was never terminated.

¶ 17    On October 11, 2016, Friedler filed a surreply to Doctors' surresponse, alleging and arguing, in part, that (1) Cannon's interest in the VA contract, and any funds associated with it, was terminated when Cannon abandoned the worksite and defaulted under the contract, (2) the funds at issue were not subject to Doctors' judgment lien because they were not an asset of Cannon, and (3) the funds at issue belonged to Friedler because it completed the work on the VA project. Friedler attached an October 5, 2016, letter from Patrick Donnelly, Thomas Cannon's purported attorney, to a VA project captain, stating, "All parties agree that [Cannon] never had and does not now have any rights to these funds."

¶ 18    On October 21, 2016, the trial court heard argument and stated that it needed a representative of the VA to testify regarding "their procedures and the reasons why" the

money was paid to Cannon, *i.e.*, whether the money was an asset of Cannon or, because of government red tape, Cannon was "a placeholder for [Friedler]." The court and the parties agreed to an evidence deposition.

¶ 19　　A signed "Declaration" of Jeffrey C. Gerbensky, a contracting officer at the VA, was submitted to the trial court, stating the following. Gerbensky was familiar with the VA contract awarded to Cannon in September 2012, for renovations pursuant to the VA project. In the fall of 2015, the VA declared Cannon to be in "technical default under the contract." Instead of:

> "officially terminating the contract for default, [the] VA and the Surety reached an agreement *** wherein the Surety would oversee the completion of the contract by [Cannon's] subcontractor Friedler ***. Because [the] VA did not officially terminate [Cannon's] contract for default, [Cannon] remained the prime contractor (and the only entity that [the] VA had privity of contract with[, ]despite the fact that [Friedler] was performing the work remaining under the contract. *** [The] VA became aware that [Cannon] has not been paying its subcontractors when [Friedler] requested that [the] VA remit contract payments directly to [Friedler] as it completed the work. [The VA] had no objection to such an arrangement, provided it could do so in compliance with the rules and regulations that govern the administration of the contract. *** [I]t was determined that [the] VA had no effective mechanism at its disposal to pay [Friedler] directly for the work it was performing on behalf of [Cannon] because [the] VA has no privity of contract with [Friedler], regulations prohibited assignment of payments to [Friedler], and statutes made it difficult for [the] VA to contract directly with [Friedler]. *** Recently, [Cannon] submitted a letter to [the] VA repudiating the subject contract and on November 4, 2016, [the] VA officially terminated the contract with [Cannon] for default. *** If the Surety agrees to enter into a takeover agreement, future payments under the contract will be made to the Surety. *** With regard to legal entitlement to the funds that [the] VA has already remitted to [Cannon] under the contract, I have no opinion. *All payments were appropriately remitted to [Cannon] as the prime contractor under [the] VA's contract.*" (Emphasis added.)

¶ 20　　On December 7, 2016, the trial court held a hearing concerning the petition, during which the court entertained argument from the parties but did not hear any evidence. The trial court determined, based on Gerbensky's declaration, that the contract between Cannon and the VA was never terminated, the surety oversaw completion of the contract by Friedler, Friedler was not "without a remedy," and the funds at issue were an asset of Cannon. The trial court denied Friedler's petition to amend and modify the TRO and granted Doctors' motion for turnover. On December 30, 2016, Friedler filed its notice of appeal.

¶ 21　　　　　　　　　　　　　II. ANALYSIS

¶ 22　　Friedler argues that the trial court erred by granting Doctors' motion for turnover. Where, as here, prior to ruling on a motion for turnover, the trial court did not conduct an evidentiary hearing and based its decision on documentary evidence, the parties' oral arguments, and the record, we review the court's ruling *de novo*. *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277, 285 (2007).

¶ 23　　In Illinois, civil judgments are enforced through supplementary proceedings pursuant to section 2-1402 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1402 (West 2016)).

Section 2-1402 of the Code "provides a mechanism by which a judgment creditor may initiate supplementary proceedings against a judgment debtor or a third party to discover the assets of a judgment debtor and apply those assets to satisfy an underlying judgment" as long as "the judgment debtor would have the right to recover such assets from the third party." (Internal quotation marks omitted.) *Stonecrafters, Inc. v. Wholesale Life Insurance Brokerage, Inc.*, 393 Ill. App. 3d 951, 958 (2009); see 735 ILCS 5/2-1402 (West 2016). The supplementary proceedings are initiated by the service of a citation to discover assets. 735 ILCS 5/2-1402(a) (West 2016). After the citation is served, the judgment becomes a lien on all nonexempt personal property belonging to the judgment debtor. 735 ILCS 5/2-1402(m) (West 2016). During the course of the supplementary proceedings, the judgment creditor may serve a citation to discover assets on a third party, requiring it to freeze the assets belonging to the judgment debtor. 735 ILCS 5/2-1402(f) (West 2016). Thus, the only relevant inquiries in the supplementary proceedings are (1) whether the judgment debtor possesses assets that should be applied to satisfy the judgment and (2) whether a third party is holding assets of the judgment debtor that should be applied to satisfy the judgment. *Gataric v. Colak*, 2016 IL App (1st) 151281, ¶ 15; *Schak v. Blom*, 334 Ill. App. 3d 129, 133 (2002).

¶ 24    Section 2-1402 is intended to provide discovery of a debtor's assets and to vest the trial court with broad power to apply discovered property to satisfy a judgment. *Kauffman v. Wrenn*, 2015 IL App (2d) 150285, ¶ 23. "The provisions of section 2-1402 are to be liberally construed, and the burden lies with the petitioner to show that the citation respondent possesses assets belonging to the judgment creditor." *Schak*, 334 Ill. App. 3d at 133.

¶ 25    Section 2-1402 states, in pertinent part, as follows:

"(c) When *assets or income of the judgment debtor* not exempt from the satisfaction of a judgment, a deduction order or garnishment are discovered, the court may, by appropriate order or judgment:

* * *

(3) Compel any person cited, other than the judgment debtor, to deliver up any *assets* so discovered, to be applied in satisfaction of the judgment ***." (Emphases added.) 735 ILCS 5/2-1402(c) (West 2016).

¶ 26    Here, Friedler argues that the trial court erred by granting Doctors' motion for turnover because the funds at issue were not an "asset" of Cannon. Friedler contends that the evidence establishes that the funds at issue never belonged to Cannon because the VA contract was "terminated when Cannon abandoned the worksite and defaulted on the contract." Friedler supports its argument with the VA's "Notice of Default" letter to the surety containing Thomas Cannon's e-mail stating, "I'm pulling off the site……deal with it in court."

¶ 27    Friedler ignores that, in that same letter, while the VA stated that it "was entitled to immediately terminate the contract," it did not do so; instead, the VA informed the surety that it was giving the surety "the opportunity to pursue other options in lieu of termination." In addition, Gerbensky stated that the contract between the VA and Cannon was not terminated until November 2016, well after the VA deposited the money into Cannon's Vet Tec account. Finally, Gerbensky stated, "*All payments were appropriately remitted to [Cannon] as the prime contractor under [the] VA's contract.*" (Emphasis added.) Accordingly, the record does not support Friedler's argument that the funds at issue were not an asset of Cannon.

¶ 28        Friedler also contends that Thomas Cannon admitted that Cannon "never had and does not now have any right to collect these funds." However, the statement was contained in the letter from Donnelly, dated October 5, 2016, more than three months after the VA deposited the funds at issue into Cannon's Vet Tec account at Thomas Cannon's direction. The letter was not an admission and normally would constitute hearsay. As hearsay, Donnelly's unsworn and unverified letter cannot support Friedler's pleadings. See *Paul H. Schwendener, Inc. v. Jupiter Electric Co.*, 358 Ill. App. 3d 65, 79 (2005). Additionally, whether Cannon had a right to the funds was a question not of fact but of law and not subject to substantive consideration as an admission. *Feret v. Schillerstrom*, 363 Ill. App. 3d 534, 540 (2006).

¶ 29        Next, Friedler argues that, even if the funds were an "asset" of Cannon, the funds should have been awarded to Friedler under the doctrine of equitable subrogation. The supreme court has examined the doctrine of subrogation and explained it as follows:

>        "The doctrine of subrogation is a creature of chancery. It is a method whereby one who has involuntarily paid a debt or claim of another succeeds to the rights of the other with respect to the claim or debt so paid. [Citation.] The right of subrogation is an equitable right and remedy which rests on the principle that substantial justice should be attained by placing ultimate responsibility for the loss upon the one against whom in good conscience it ought to fall. [Citation.] Subrogation is allowed to prevent injustice and unjust enrichment but will not be allowed where it would be inequitable to do so. [Citation.] There is no general rule which can be laid down to determine whether a right of subrogation exists since this right depends upon the equities of each particular case. [Citation].
>
>        One who asserts a right of subrogation must step into the shoes of, or be substituted for, the one whose claim or debt he has paid and can only enforce those rights which the latter could enforce. [Citation.]" *Dix Mutual Insurance Co. v. LaFramboise*, 149 Ill. 2d 314, 319 (1992).

¶ 30        Here, Friedler alleged that it completed the work on the VA project that Cannon should have completed. Thus, to recover under the doctrine of equitable subrogation, Friedler must step into the shoes of Cannon and can enforce only those rights that Cannon could enforce. See *id.* But Friedler fails to establish how Cannon had any rights to enforce against Doctors where Doctors had a perfected judgment lien against Cannon. In addition, Friedler fails to explain how Doctors was ultimately responsible for Friedler's loss or how substantial justice would be attained by placing ultimate responsibility for that loss upon Doctors. For these reasons, equitable subrogation does not apply here.

¶ 31        Friedler cites *Detroit Steel Products Co. v. Hudes*, 17 Ill. App. 2d 514 (1958), to support its argument. In *Hudes*, the appellate court held that a mortgagee bank was entitled, under equitable subrogation principles, to be subrogated to the claims of certain materialmen whom the bank had paid out of the proceeds of a construction loan, even though the bank failed to obtain assignments of those individuals' claims, as required by statute. The appellate court determined that the bank's actions in satisfying known lien claimants showed that it acted with the "expectation" that its mortgage would be a first lien against the premises. *Id.* at 521. In addition, the court determined that no prejudice resulted to the remaining materialmen with claims to the loan proceeds since they would have had to share the proceeds, in any event, with those materialmen whom the bank had paid and to whom the bank was entitled to be subrogated. *Id.* Here, in contrast to *Hudes*, the record shows that Friedler had no

reasonable "expectation" that it would acquire a first lien in Cannon's assets because it did not obtain a judgment against Cannon, it knew that it was not in privity with the VA, and there is no evidence that it received approval from the VA to be paid directly. Further, as the *Hudes* court noted, subrogation is appropriate only when its application will not result in prejudice to the legal and equitable rights of others. *Id.* at 520-21. In this case, allowing Friedler to take on the status of a priority lienholder based solely on its unreasonable "expectation" of acquiring such status would prejudice Doctors, which obtained a judgment lien and perfected it prior to Friedler's intervention in this case. Accordingly, *Hudes* is distinguishable from this case.

¶ 32    Finally, Friedler argues that the trial court erred by determining that Friedler had a legitimate remedy, which was to make a claim against the surety. We note that the trial court actually stated that Friedler was not "without a remedy." The issue of what remedy, if any, Friedler might have had was not before the trial court. Curiously, Friedler has failed to explain why it had no remedy against Cannon. Therefore, we need not address this issue.

¶ 33    Generally, a lien that is first in time has priority over subsequent liens against the same property. *Bloink v. Olson*, 265 Ill. App. 3d 711, 718 (1994). The service of the citation to discover assets created a perfected lien in favor of Doctors. See *id.* Friedler had not obtained a money judgment against Cannon. Even if Friedler had obtained a money judgment against Cannon and initiated supplementary proceedings, its lien would be subsequent to Doctors' lien. See *id.* at 718-19. Accordingly, the trial court properly granted Doctors' motion for turnover and denied Friedler's motion.

¶ 34                                  III. CONCLUSION
¶ 35    For the reasons stated, we affirm the trial court's order.

¶ 36    Affirmed.