# Illinois Official Reports

## Appellate Court

> ### *People v. Elkins*, 2019 IL App (1st) 161798

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIFFANY ELKINS, Defendant-Appellant (The Cook County Public Defender, Intervenor-Appellee). |
| District & No. | First District, Second Division<br>No. 1-16-1798 |
| Filed | November 26, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2011-CR-1554101; the Hon. Allen F. Murphy, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Stephen L. Richards, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Assistant State's Attorney, of counsel), for the People.<br><br>Amy Campanelli, Public Defender, of Chicago (Karen Dimond and Lester Finkle, Assistant Public Defenders, of counsel), for intervenor-appellee. |

Panel | JUSTICE COGHLAN delivered the judgment of the court, with opinion.
Justices Lavin and Pucinski concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant, Tiffany Elkins, was convicted of first degree murder in the shooting death of Devonte "Boo Man" Harris after being identified as the shooter by multiple eyewitnesses. She was represented by the Cook County Public Defender's Office at trial. Prior to sentencing, she retained private counsel who issued a subpoena for the public defender's entire trial file, including work product, for use in preparing a motion for a new trial. The trial court *sua sponte* quashed the subpoena, finding that the public defender had "no obligation at all" to tender "any of their file" to successor counsel.

¶ 2    Elkins appeals, arguing that the trial court erred in quashing the subpoena and challenging her conviction on various other grounds. Under the facts of this case, where successor counsel sought his client's trial file in connection with ongoing proceedings, we find the trial court erred in declaring the entire file off-limits on the basis of the work-product doctrine. We therefore vacate the order quashing the subpoena and remand for further posttrial proceedings without reaching Elkins's other contentions of error.

¶ 3                                    BACKGROUND

¶ 4    On August 19, 2011, shortly before 11 p.m., 18-year-old Devonte Harris went to the Strack & Van Til grocery store in Calumet City, where he met up with several other teenagers: Darion Thomas, Akira Willis, her sister Ajahnique, Mikiyell Morgan, and John Thompson. It was a Friday evening, and they intended to go to Thomas's house together.

¶ 5    As they walked along Douglas Avenue, a car pulled up next to them with the passenger side facing them. The driver, whom Willis later identified as Elkins, mentioned that someone got into a fight at school, and she asked if they knew "Boo Man." They said no and kept walking. Elkins drove alongside them and repeated her question. Harris approached the car and identified himself as Boo Man. He spoke briefly with Elkins, then returned to the sidewalk.

¶ 6    As Harris and his friends continued walking, Elkins had a loud conversation on her cell phone. Morgan overheard her saying, "Put Ferris[1] on the phone." After further conversation, she said "Here go Boo Man right here" and "F*** it, I'm gonna blow the whole crowd." Willis overheard Elkins yelling: "Boo Man right here, but he with *** some girls. I'm finna shoot the whole crowd up. I don't care."

¶ 7    Elkins then started firing a gun out the passenger-side window. She fired four to six shots as the group ran. Harris's friends made it safely to Thomas's house, but Harris was fatally shot in the back of the neck.

¶ 8    Willis identified Elkins as the shooter in a photo lineup on August 21 and an in-person lineup on August 23. She also identified Elkins in court and was "[v]ery sure" of her

---

[1]Ferris's name is also spelled "Farris" and "Pherris" in the record. It is unclear which spelling is correct.

identification. As for Morgan, he did not see the shooter's face, but he noticed that she was light-skinned. He identified Elkins as the shooter in a photo lineup and a physical lineup but only because of her complexion. He could not identify her in court.

¶ 9  The shooting was also witnessed by Jason Dickson, a youth care specialist. At around 11 p.m., Dickson was sitting on his front porch playing dominos with his cousin; he had drunk two glasses of vodka with orange juice. He saw headlights from a car moving south on Douglas Avenue, which was unusual because it was a one-way street going north. The car pulled up alongside a group of "kids" walking down the sidewalk; the kids stopped, about five gunshots rang out, the kids ran, and the car sped away toward Dickson's house. Dickson came down the stairs of his porch, and the car passed within 10 feet of him. He got a clear view of the driver's face, which was illuminated by the light of her cell phone.

¶ 10  On August 21, two days after the shooting, police showed Dickson an array of six photographs. Dickson was unable to identify anyone. But at an in-person lineup on August 23, Dickson identified Elkins as the driver and was "100 percent" sure of his identification at that time. He also identified Elkins in open court. On cross-examination, Dickson admitted that earlier that day, the prosecutor had shown him a photograph of the in-person lineup and he could not recall who he previously identified as the shooter. He also admitted telling the prosecutor, "If the woman in the car walked past me today, I [would] not be able to identify her."

¶ 11  Myeisha Mitchem testified that, in August 2011, her father was Elkins's boyfriend. Mitchem was 12 years old at the time. A couple days before the shooting, she saw Elkins take a gun from her car door and put it in her purse. She also saw Elkins with a gun on at least one prior occasion.

¶ 12  Elkins had a close relationship with her brother Ferris. On the evening of August 19, Ferris returned home from a football game at school and spoke about something that happened at the game. Later that night, Elkins called Mitchem and asked her to put Ferris on the phone. Mitchem heard Ferris give Elkins a name—"Boo Man"—and a description. They finished their conversation, and Ferris returned the phone to Mitchem. Elkins was still on the other end of the line. Mitchem heard Elkins asking someone if his name was "Boo Man," and then she heard two gunshots. She ended the call.

¶ 13  An hour later, Elkins called Mitchem again and asked if the police had come around. Mitchem said no, to which Elkins replied: "Don't say nothing to them."

¶ 14  On August 21, 2011, Elkins was arrested and charged with the first degree murder of Harris. Elkins was represented by the Cook County Public Defender's Office. On September 24, 2015, a jury found her guilty of first degree murder. After her conviction but prior to sentencing, attorney Algis Baliunas filed an appearance on her behalf, and the public defender withdrew. Baliunas said he would ask the public defender's office to transfer discovery materials to him, including "paper notes and documents." The assistant public defender (APD) who represented Elkins at trial replied:

> "In terms of the discovery ***, it is still an open murder case in our office. There's bonds, and there are other lawyers looking into it. So I don't think we will be in a position to hand him discovery. He is going to have to go to the State for that, because we won't be willing to tender that."

Baliunas clarified that he wanted the public defender's "entire trial file," including "investigator slips" and "trial notes." The trial court directed him to file a written motion, stating that it was a "very unique issue" because "you are talking about attorney work."

¶ 15    Baliunas later issued a subpoena to Elkins's APD seeking the trial file. Specifically, he sought "any and all discovery materials, any and all materials accumulated on behalf of the defendant, any and all investigative requests and results, any and all notes, pretrial and trial." At a hearing on October 20, 2015, Baliunas argued that he needed those materials in order to prepare a motion for a new trial. He acknowledged that his request included attorney work product, stating: "Work product on whose behalf? On defendant's behalf."

¶ 16    The APD was not willing to hand over the trial file, explaining:

> "[T]hings he requested like my notes, investigative reports, I think he knows better. He is not entitled to those things. *** I think most of the file is work product. When you do a jury trial you write notes everywhere. There are notes all over the police reports. There are notes in the file, outside the file. Certainly stuff he is not entitled to. It is my work product."

¶ 17    After hearing arguments by the parties, the court *sua sponte* quashed Baliunas's subpoena, stating that it did not believe the APD had an obligation to turn over its file to successor counsel. At a later hearing on April 20, 2016, the court clarified its reasoning: "Of course I denied Mr. Baliunas' request for the public defender's file in this case, as I deem it to be work product. *** I believe that the attorneys' file is absolutely inviolate."

¶ 18    Baliunas filed a motion for a new trial. The motion alleged, among other things, that the APD was ineffective because he failed to adequately investigate the case and prepare for trial. In an attached affidavit, Elkins alleged that the APD only visited her once in jail before trial. She also alleged that he did not interview or investigate her alibi witnesses or any of the State's witnesses.

¶ 19    At the hearing on the motion, the APD testified that he regularly met with Elkins at monthly status hearings in court. Many of their meetings were conducted in a private interview room and generally lasted up to 20 minutes. The APD "told her about every witness *** and what the witness would say and what the evidence was." Elkins never indicated that she wanted to present an alibi defense or provided the name of an alibi witness. Although the APD personally contacted several of the State's witnesses, none of them were willing to speak to him.

¶ 20    At the conclusion of the hearing, Baliunas stated that he was unable to properly prepare his motion for a new trial without access to Elkins's trial file. He argued that "any notes taken from interviews, anything of that nature would be very helpful" in establishing ineffective assistance of counsel. The trial court denied Elkins's motion for a new trial.

¶ 21                                    ANALYSIS

¶ 22    Elkins contends that the trial court erred by quashing Baliunas's subpoena for the public defender's trial file. She argues, and the State agrees, that she has a right to predecessor counsel's "entire file"—*i.e.*, any and all documents related to her representation, inclusive of work product. The Cook County Public Defender, whom we have allowed to intervene in this appeal, argues that "[a]n attorney's work-product *** should be disclosed only in limited situations and only after an *in camera* review to insure that only documents which *must* be released are released and confidential information is protected." (Emphasis in original.)

¶ 23    Initially, the parties disagree as to whether a lawyer can assert the work-product privilege against a former client. Elkins argues that the work-product privilege applies only to discovery requests by opposing parties, not to requests by clients or former clients for whose benefit the documents at issue were originally prepared. The public defender argues that attorneys have an independent interest in the privacy of their work product.

¶ 24    Work product is defined as any material "prepared by a lawyer for litigation then in progress or in reasonable anticipation of future litigation." Restatement (Third) of the Law Governing Lawyers § 87(1) (2000). Of particular importance is opinion or "core" work product, *i.e.*, materials that reveal a lawyer's opinions, mental impressions, or trial strategy. *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 196 (1991); Restatement (Third) of the Law Governing Lawyers § 87(2) (2000). It is well established that attorney work product, especially opinion work product, is entitled to protection "from unnecessary intrusion by opposing parties and their counsel." (Internal quotation marks omitted.) *People v. Spiezer*, 316 Ill. App. 3d 75, 80-81 (2000). Thus, in the criminal context, neither the State nor the defense is required to disclose legal research, opinions, theories, or conclusions to the opposing party. Ill. S. Ct. R. 412 (j)(i) (eff. Mar. 1, 2001) (governing disclosures by the prosecution to the defense); see also Ill. S. Ct. R. 413 (eff. July 1, 1982) (governing disclosures by the defense to the prosecution).

¶ 25    But Elkins does not seek an opposing party's work product; she wants access to her own counsel's file. The Restatement (Third) of the Law Governing Lawyers (Restatement) states: "Where the interests of the lawyer and the client conflict [citations], the lawyer may not use the work-product protection to deny the client access to relevant work-product materials." Restatement (Third) of the Law Governing Lawyers § 92 cmt. c (2000); see also *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006) (attorney may only invoke work-product privilege "as long as invoking the privilege would not harm the client's interests"). Of particular relevance to this case, the Restatement specifically provides:

> "Work-product immunity is waived for any relevant material if the client asserts as to a material issue in a proceeding that:
>
>    ***
>
>    (b) a lawyer's assistance was ineffective, negligent, or otherwise wrongful."
> Restatement (Third) of the Law Governing Lawyers § 92(1)(b) (2000).

¶ 26    In *Waste Management*, 144 Ill. 2d at 200, our supreme court held that "where *** an attorney represents the common interests of two or more clients whose relationship subsequently becomes adverse, and, in a subsequent action, the work product of the attorney is at issue, Rule 201(b)(2) [(work-product privilege in civil proceedings)] [citation] is not available to bar discovery by one of the original parties." In the underlying suit, counsel represented the common interests of both insureds and their insurers against a third-party adversary. After the underlying suit settled, the insurers denied coverage. In the ensuing declaratory judgment action between insureds and insurers, the insurers sought to discover counsel's work product from the underlying suit. The *Waste Management* court held that work-product privilege did not apply, explaining:

> "In the typical case, material is generated in preparation for trial against an adversary who may seek disclosure of his opponent's work product. Here, the sought-after materials were, in the first instance, prepared for the mutual benefit of insureds and insurers against a third-party adversary. Insurers were not the adversary from

whom the attorney's trial strategies and opinions required protection. Insurers and insureds have only become adversarial since the termination of the primary litigation. While the work-product materials, had they been requested by the third-party opponent in the underlying lawsuit, would have been entitled to protection, that same protection is not warranted here. This, we firmly believe, was not the situation contemplated by *Hickman* and Rule 201(b)(2)." *Id.* at 197-98.

The court also found it relevant that "[p]art of what insurers seek to discover is in fact the mental impressions and case assessment of defense counsel. We can think of no source, outside the files, where this information might be obtained." *Id.* at 199. Thus, our supreme court held that the insurers were entitled to discover counsel's files from the underlying suit. *Id.* at 200.

¶ 27    Similarly, Elkins points out that her trial file was prepared for her benefit against a third-party adversary, *i.e.*, the State. Elkins is not the adversary from whom the public defender's trial strategies and opinions require protection. Thus, although the public defender's work product would certainly be immune from discovery if requested by the State (Ill. S. Ct. R. 413 (eff. July 1, 1982)), Elkins argues that the same protection should not apply here.

¶ 28    Although *Waste Management* was a civil case dealing with the applicability of Illinois Supreme Court Rule 201(b)(2) (eff. July 1, 1982) (work-product privilege in civil proceedings), its reasoning remains cogent in the criminal context. More recently, in *People v. Dixon*, 2019 IL App (1st) 160443, ¶ 54, a divided panel of this court held that a *pro se* postconviction petitioner was entitled to access his trial counsel's case file, excepting only information that was confidential when disclosed to trial counsel. *Dixon* held that "the trial court should have adopted, as nearly as practicable, an open-file policy regarding Dixon's access to his own trial counsel's case file." *Id.*

¶ 29    At this juncture, we note that the public defender was not aware of the *Dixon* decision until after it was issued and did not participate in the arguments presented to the court in that case. Thus, this appeal is our first opportunity to consider the public defender's position regarding disclosure of its own work product.

¶ 30    The public defender argues that Illinois law recognizes limitations on a client's entitlement to access her counsel's work product, citing an Illinois State Bar Association (ISBA) advisory opinion (ISBA Op. No. 94-13 (Jan. 1995), https://www.isba.org/sites/default/files/ethics opinions/94-13.pdf [https://perma.cc/6NR7-226D]). See *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277, 291-92 (2007) (recognizing ISBA advisory opinions as persuasive authority). In opinion No. 94-13, the client had received a court-martial conviction for several offenses, including the maiming of his former wife with a knife. He asked his attorney to hand over investigative materials related to his former wife. Counsel was reluctant to comply out of concern for the former wife's safety.

¶ 31    In considering counsel's ethical obligations, the ISBA opined that a client typically has no entitlement to materials "prepared only for the lawyer's internal use," such as administrative materials and "the lawyer's notes, drafts, internal memoranda, legal research, and factual research materials, including investigative reports, prepared by or for the lawyer for the use of the lawyer in the representation." ISBA Op. No. 94-13, at 3, 4. In that scenario, "the failure of the lawyer to deliver or provide access to such materials [would] not prejudice the client." *Id.* at 4. In contrast, the instant case involves allegations of ineffective assistance of counsel in an ongoing criminal proceeding. Under these circumstances, it is possible that the public defender's refusal to provide access to its file may prejudice Elkins. Accordingly, we do not

find opinion No. 94-13 persuasive on the issue of whether, and to what extent, the public defender should be required to disclose its trial file to successor counsel in the instant case.

¶ 32     The public defender also cites *People v. Mack*, 128 Ill. 2d 231 (1989), as a case where attorney work product was not discoverable even though it was directly at issue in an ongoing proceeding. *Mack* is distinguishable because, unlike the present case, it dealt with discovery of an opponent's work product.

¶ 33     The public defender next asserts that a sweeping "open-file policy" is problematic because trial files may contain sensitive material such as contact information for witnesses or "honest, but unflattering" notes regarding the client, the prosecutor, the judge, or prospective jurors. Although *Dixon* recognized "the need for continued confidentiality of documents that were confidential when disclosed to trial counsel" (*Dixon*, 2019 IL App (1st) 160443, ¶ 54), the public defender persuasively argues that these are not the only documents in need of protection because trial counsel "often *creates* documents that need to be kept confidential." (Emphasis in original.) We agree. Although sensitive work-product material, as described by the public defender, may at times be relevant to a client's claim, there are other instances where it will have no material impact on any issue and may be withheld without prejudicing the client. See *Hobley*, 433 F.3d at 949 (attorney has an independent privacy interest in his work product as long as asserting privilege does not harm his client's interests).

¶ 34     In light of the foregoing discussion, we find that the trial court erred in finding the public defender's file to be "absolutely inviolate" and in quashing Baliunas's subpoena in its entirety. If a defendant retains new counsel during the pendency of a criminal proceeding and signs a written release authorizing her trial file to be sent to successor counsel, undisputed portions of the file should be turned over. As to disputed portions of the file, the trial judge has discretion to withhold any material that poses a substantial risk of causing physical harm, intimidation, annoyance, or embarrassment to any person or for any other factor determined to outweigh the usefulness of disclosure. *Cf. People v. Madonaldo*, 193 Ill. App. 3d 1062, 1068 (1989) (trial court has discretion to bar disclosure of witness addresses to counsel where a "substantial risk" of physical harm, intimidation, annoyance, or embarrassment outweighs the usefulness of disclosure). But on this record, we cannot say whether Elkins's file contains any such material since the trial court quashed Baliunas's subpoena without any substantive consideration of the contents of the file.

¶ 35     We additionally observe that Elkins never sent a written release to the public defender authorizing her trial file to be sent to successor counsel. The public defender argues, and we agree, that Elkins's file should not be sent to successor counsel without such a release since successor counsel's right to the materials therein is entirely derivative of Elkins's right.

¶ 36     Finally, regarding the procedure to be followed on remand, the public defender stated during oral argument that it has a procedure for handling subpoenas of a client's file by successor counsel in an ongoing proceeding, as follows: The public defender turns over the file with the exception of any documents that it considers privileged or otherwise sensitive, which it lists in an itemized privilege log. If successor counsel wants and believes he is entitled to any of the specific documents set forth in the privilege log, he may file a motion to compel their production.

¶ 37    We note that the public defender did not follow its own avowed procedures in this case, where it demonstrated a categorical unwillingness to disclose any portion of Elkins's file.[2] In any event, we find this procedure strikes an appropriate balance between the interests at issue here. Successor counsel automatically gets all documents as to which there is no dispute, which may be a significant portion of the client's file. Successor counsel also knows which documents are being withheld and can determine, on that basis, whether they are likely to be material to the case. If counsel chooses to file a motion to compel, the trial court retains discretion to resolve the dispute.

¶ 38    We therefore reverse the trial court's order quashing the subpoena and remand for further posttrial proceedings. Assuming that Elkins executes a written release authorizing her file to be sent to successor counsel, the public defender should turn over the file, except for any documents that it alleges are confidential or privileged, which should be detailed in an itemized privilege log. Elkins may, if she wishes, move to compel production of any of those documents, whereupon the trial court can inspect the documents *in camera* to determine their relevance to Elkins's posttrial claims and whether such relevance outweighs any risk of causing physical harm, intimidation, annoyance, or embarrassment to any person or any other such factor. Elkins may then file an amended motion for a new trial, in which she may reassert any previously raised claims or raise any new claims based on the material contained in her file.

¶ 39    Because the trial court erred in quashing Elkins's subpoena based on an incorrect understanding of the work-product doctrine, we need not consider Elkins's alternative claims regarding her constitutional rights to compulsory process or the effective assistance of posttrial counsel. See *People v. White*, 2011 IL 109689, ¶ 148 ("it is a fundamental rule of judicial restraint that a court not reach *constitutional* questions in advance of the necessity of deciding them" (emphasis in original)). Additionally, since we are granting Elkins the opportunity to file a new posttrial motion in which she may supplement her existing claims of pretrial and trial error, we make no ruling on those claims at this time.

¶ 40                                                    CONCLUSION
¶ 41    For the foregoing reasons, we find the trial court erred in quashing Elkins's subpoena of the public defender's trial file on the basis of the work-product doctrine. We reverse the quashing of the subpoena and remand for further posttrial proceedings consistent with this opinion.

¶ 42    Reversed and remanded.

---

[2]At the hearing on Baliunas's subpoena, the APD stated: "I was instructed by my office we are not willing to turn [the file] over." He further explained, "I don't have the authority to hand stuff over. I have supervisors and chiefs." Similarly, at the hearing on Elkins's posttrial motion, the APD testified, "I've been told by my office not to turn [the file] over."